UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SIERRA DEVELOPMENT CO. dba CLUB CAL NEVA,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>CHARTWELL ADVISORY GROUP, LTD.,<br><br>　　　　　　　　　　　　Defendant.<br><br>AND RELATED CLAIMS. | Case No. 3:13-CV-0602-RTB (VPC)<br><br>**ORDER** |

　　　　MGM Resorts International ("MGM") submitted its initial privilege log to the court for an *in camera* review of twenty-one documents concerning communications among individuals from MGM, MGM's counsel, members of the Nevada Resort Association ("NRA"), and R&R Partners ("R&R") (ECF No. 458).  Pursuant to this court's subsequent order (ECF No. 465), the court directed MGM to provide additional detail, and MGM did so (ECF No. 479).

　　　　The documents at issue in the MGM privilege log[1] concern communications about the May 2013 settlement agreement with the State of Nevada in what is called the "food comp case." The documents fall into three categories: (1) those covered by the classic attorney-client privilege; (2) those covered by the common interest doctrine; and (3) those covered by the functional equivalence doctrine. This order follows.

---

[1] For ease of reference, the court refers to the pages in the privilege log as "MGM" followed by the last four digits of the page number.

I. **Legal Discussion**

A. <u>**The Attorney-Client Privilege**</u>

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981). The privilege protects confidential communications between an attorney and the client to encourage "full and frank communication between a party and its attorney and thereby promote the broader public interest in the observance of the law and administration of justice." *Id.* Corporations may also invoke the attorney-client privilege. *Id.* at 389-90

Rule 501 of the Federal Rules of Evidence provides that in a civil action where state law supplies the rule of decision, state law also governs privilege. *See* Fed. R. Evid. 501. Because the communications at issue in this case took place in Nevada, Nevada law of privilege applies. *See Aparicio v. Baumann,* 7 F.Supp.3d 1100, 1103 (D. Nev. 2014).

Nevada's attorney-client privilege provides:

> A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications:
>
> 1. Between the client or the client's representative and the client's lawyer or the representative of the client's lawyer;
> 2. Between the client's lawyer and the lawyer's representative;
> 3. Made for the purpose of facilitating the rendition of professional legal services to the client, by the client or the client's lawyer to a lawyer representing another in a matter of common interest.

Nev. Rev. Stat. § 49.095. A communication is confidential "if it is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." Nev. Rev. Stat. § 49.055. A "representative of the client" is "a person having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client." Nev. Rev. Stat. § 49.075.

The Nevada Supreme Court has held that the attorney-client privilege should be narrowly construed because it obstructs the search for truth. *See Whitehead v. Comm'n. on Jud.*

1  *Discipline,* 110 Nev. 380, 873 P.2d 946, 968 (1994). The party claiming an attorney-client
2  privilege also bears the burden of proving that the privilege applies to the disputed
3  communication or documents. *See Phillips v. C.R. Bard, Inc.,* 290 F.R.D. 615, 627 (D.Nev.
4  2013) (citing *In re Grand Jury Investigation,* 974 F.2d 1068, 1070 (9th Cir. 1992).

5  In *Wardleigh v. Second Judicial District,* 111 Nev. 345, 891 P.2d 1180 (1995), the
6  Nevada Supreme Court adopted the United States Supreme Court's holding in *Upjohn,* which
7  focuses on the nature of the subject matters sought in discovery for purposes of applying the
8  attorney-client privilege. *See Wardleigh,* 891 P.2d at 1184-85 (citations omitted). The Nevada
9  Supreme Court found that the attorney-client privilege may be asserted by a corporation, but
10 rejected the "control group" test, which only applied the privilege to a select group of managerial
11 corporate employees. However, as to the issues before the court in this case – the common
12 interest doctrine and the functional equivalent doctrine – there is a dearth of Nevada case law.
13 Therefore, the court looks to the decisional law in other courts. *See Takahashi v. Loomis
14 Armored Car Serv.,* 625 F.2d 314, 316, (9th Cir. 1980) (citations omitted); *see also U.S. v.
15 Bibbins,* 637 F.3d 1087 (9th Cir. 2011) (citing *Takahashi,* 625 F.2d at 316) (in the absence of
16 Nevada law, the court looked to decisions in other jurisdictions).

17 The voluntary disclosure of a privileged attorney-client communication generally
18 constitutes a waiver of the privilege as to all other communications regarding the same subject
19 matter. *United States v. Zolin,* 809 F.2d 1411, 1415 (9th Cir. 1987). "[I]t is a general rule that
20 attorney-client communications made 'in the presence of, or shared with, third-parties destroys
21 the confidentiality of the communications and the privilege protection that is dependent upon
22 that confidentiality.'" *Nidec Corp. v. Victor Co. of Japan,* 249 F.R.D. 575, 578 (N.D.Cal. 2007)
23 (quoting 1 Paul R. Rice, *Attorney-Client Privilege in the United States,* § 4:35 at 195 (1999 ed.).
24 To establish the applicability of the privilege in an attorney-client communication made in the
25 presence of a third party, the party asserting the privilege must affirmatively demonstrate non-
26 waiver. *Zolin ,* 809 F.2d at 1415.

### B. The Common Interest Doctrine

There are exceptions to the rule that communications between a lawyer and client that include third parties are deemed a waiver of the privilege. One of them is the common interest doctrine, which is not a privilege in and of itself; instead it is an exception to the rule on waiver when communications are disclosed to third parties. *Nidec* at 578. The common interest doctrine (1) assumes the existence of a valid underlying privilege (2) that there is a valid basis for exchanging information with a third party (3) without undermining the necessity of confidentiality for the attorney-client privilege to apply. Edna Selan Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* at 274 (5th ed. 2007). In essence, "the privileged communications shared among and within a certain group of people will be deemed to have been made in confidence." *Id.*

The rationale for the rule is that "persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute and defend claims." *In re Grand Jury Subpoenas,* 902 F.2d 244, 249 (4th Cir. 1999) (citing *Transmirra Products Corp. v. Monsanto Chemical Co.,* 26 F.R.D. 572, 578 (S.D.N.Y. 1960). The basis of the common interest doctrine "focuses not on when documents were generated, but on the circumstances surrounding the disclosure of privileged documents to a jointly interested third party." *Id.* Because the common interest doctrine is an anti-waiver exception, "it comes into play only if the communication at issue is privileged in the first instance." *Nidec,* 249 F.R.D. at 578. Additionally, for the common interest doctrine to apply, the parties must share a common legal interest, rather than simply a financial or business interest. *Bank Brussels Lambert v. Credit Lyonnaise (Suisse) SA,* 160 F.R.D. 437, 447 (S.D.N.Y. 1995). Even if the parties share a common legal interest, the common interest doctrine requires that the communication in question be designed to further that legal effort. *Nidec,* 249 F.R.D. at 579 (citing *United States v. Bergonzi,* 216 F.R.D. 487, 495 (N.D.Cal. 2003).

### C. The Functional Equivalent Doctrine

In *Upjohn Co. v. United States,* 449 U.S. at 394, the Supreme Court held that a corporation's attorney-client privilege extends to communications between its employees and

- 4 -

counsel, as long as the communications are made "at the direction of corporate superiors in order to secure legal advice," concern "matters within the scope of the employees' corporate duties," and the employees were "sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." The Eighth Circuit applied *Upjohn* and considered whether the privilege should extend to communications between a partnership's counsel and an independent contractor. *In re Bieter Co.,* 16 F.3d 929, 937-38 (8th Cir. 1994). The court reasoned that "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *Id.* Since the contractor in question interacted on a daily basis with the partnership's principals and was "intimately involved" in the transaction that gave rise to the suit, there was "no principled basis to distinguish [his] role from that of an employee." *Id.* at 933-34, 938.

The Ninth Circuit adopted *Bieter's* "functional employee" principles in *United States v. Graf,* 610 F.3d 1148, 1159 (9th Cir. 2010). The court held that a consultant who "regularly communicated with insurance brokers and others on behalf of [the company], marketed the company's insurance plans, managed its employees, and was the company's voice in it communications with counsel" was a functional employee; therefore, the communications between him and corporate counsel were privileged. *Id.* at 1158-59.

In *Fosbre v. Las Vegas Sands Corp.,* Case No. 2:10-cv-00765-APG-GWF, 2016 WL 183476, at *3-*4 (D. Nev. Jan. 14, 2016), this court reviewed the various approaches to the functional equivalent doctrine. The narrower approach is set forth in *Export-Import Bank of the United States v. Asia Pulp & Paper Co.,* 232 F.R.D. 103 (S.D.N.Y. 2005). Under that test, the court considers whether a consultant is the functional equivalent of an employee by looking to whether the consultant was responsible for a key corporate job, the nature of the working relationship between the consultant and the principals, whether the relationship was critical to the company's position in litigation, and whether the consultant possessed information not held by others in the company. *Export-Import Bank,* 232 F.R.D. at 113. However, the *Fosbre* court rejected *Export-Import Bank* in favor of a "broad practical approach in applying the functional

1  equivalent doctrine that better fits "today's marketplace." 2016 WL 183476, at *4 (discussing *In re Flonase Antitrust Litig.,* 879 F.Supp.2d 454, 459 (E.D.Pa. 2012); *Stafford Trading, Inc., v. Lovely,* No. 05-C-4868, 2007 WL 611252, at *5 (N.D. Ill. Feb. 22, 2007)). *Fosbre* reasoned that the pivotal question is "whether the consultant performs duties similar to those performed by an employee and whether by virtue of that relationship, he or she possesses information about the company that would assist the company's attorneys in rendering legal advice." *Id.* at *5.

The court in *Fosbre* held that because "Goldman Sachs acted in the role of financial advisor to the upper echelon of [the company's] management," attended Board of Directors meetings, and made recommendations as to financing alternatives, among other things, the relationship between Goldman Sachs and the company was "not an 'arms-length' negotiation," but rather "that of a financial advisor developing [the company's] complex financial strategy." *Id.* at *5. In sum, Goldman Sachs personnel were the functional equivalent of company employees. *Id.*

Regardless of which approach the court takes, the party asserting a functional equivalence argument must make a "detailed factual showing" to establish that the third party is a functional equivalent of an employee. *See Energy Capital Corp. v. United States,* 45 Fed. Cl. 481, 492 (2000) (noting that "a detailed factual showing is necessary to establish the relationship between a third party that is sought to be included within the protection of the attorney-client privilege," and describing the affidavits considered in *Bieter* as "very detailed'"); *Horton v. United States,* 204 F.R.D. 670, 672 (D. Colo. 2002) (same).

**II.    Analysis**[2]

   **A.    Communications between Mr. Bice, In-House Counsel and MGM Employees**

Mr. Bice serves as outside counsel to MGM, and the privilege log includes email communications between Mr. Bice and MGM representatives. There is also one email exchange that includes Mr. Holloway, MGM's in-house counsel, and one email exchange between Mr.

---

[2]Tab 1 of the MGM privilege log identified twelve pages of documents; however, the binder delivered to the court contains only two pages of documents: MGM 5199 and 5210. Of these two pages, MGM asserts the attorney-client privilege only as to MGM 5199. Pursuant to the court's analysis of the functional equivalent doctrine, *infra*, this document shall be produced. As to the balance of Tab 1 documents, they were not produced, and the court deems any privilege waived. They shall also be produced to Chartwell.

Bartlett and an MGM employee. The court has reviewed each of these entries and finds that the following emails are protected by the attorney-client privilege:

| | | | |
|---|---|---|---|
| Tab 2: | MGM 5213-5214 | 5-22-13 Bice and Sani emails |
| Tab 3: | MGM 6291-6292 | 5-22-13 Bice and Sani emails |
| Tab 4: | MGM 6300-6301 | 5-22-13 Bice and Sani emails |
| Tab 5: | MGM 6310-6311 | 5-22-13 Bice and Sani emails |
| Tab 6: | MGM 6322-6323 | 5-22-13 Bice and Sani emails |
| Tab 7: | MGM 6404 | 5-2-13   Bice and Sani emails |
| Tab 8: | MGM 6410 | 5-2-13 Bice and Sani emails |
| Tab 9: | MGM 6420-6421 | 5-2/3-13 Bice and Sani emails |
| Tab 10: | MGM 6432-6433 | 5-2-13 Bice and Sani emails |
| Tab 11: | MGM 6447-6449 | 5-2-13 Bice and Sani emails |
| Tab 12: | MGM 6458-6459 | 5-2-13 Bice and Sani emails |
| Tab 13: | MGM 6490-6491 | 5-2-13 Bice and Sani emails |
| Tab 14: | MGM 6507-6508 | 5-2-13 Bice and Sani emails |
| Tab 15: | MGM 6903-6904 | 5/24/13  Krasn and Bartlett emails |
| Tab 16: | MGM 6932 | 5-2-13 Bice and Sani emails |
| Tab 17: | MGM 6939-40 | 5-2-13 Bice and Sani emails |
| | MGM 6938 | 5-2/3-13 emails: Tabrizi, Floyd, Holloway, Bice, Sani & Krasn |
| Tab 18: | MGM 7601 | 5-2-13 Bice and Sani emails |
| Tab 19: | MGM 7604 | 5-2-13 Bice and Sani emails |
| Tab 20: | MGM 7608-7609 | 5-2-13 Bice and Sani emails |
| | MGM 7606-7607 | 5-3-13 emails: Tabrizi, Floyd, Holloway, Bice, Sani & Krasn |

**B.    Communications Protected by the Common Interest Doctrine**

The court finds that there are a limited number of communications that are protected from disclosure by the common interest doctrine because they were shared "among and within a

certain group of people [that are] deemed to have been made in confidence." *Epstein* at 274. The court agrees that this exception to the waiver of the attorney-client privilege applies to those communications MGM and its counsel sent and received from the NRA and its members on a matter of common interest, namely, the food comp dispute. The documents include the following:

| | | | |
|---|---|---|---|
| Tab 4: | MGM 6299 | 5-22-13 emails - MGM, NRA, and NRA members |
| Tab 7: | MGM 6405 | 5-2-13 internal MGM emails |
| Tab 8: | MGM 6410-11 | 5-2-13 internal MGM emails |
| Tab 9: | MGM 6421-23 | 5-2-13 internal MGM emails |
| | MGM 6414 | 5-6-13 internal MGM emails |
| Tab 10: | MGM 6433-35 | 5-2-13 internal MGM emails |
| Tab 17: | MGM 6938 | 5-3/4-13 internal MGM emails |
| Tab 20: | MGM7606-07 | 5-3-13 internal MGM emails |
| Tab 21: | MGM 9081-99 | 8-31-12 email to Boyd/MGM |

C.   **Communications Protected by the Functional Equivalent Doctrine**

Before discussing whether the functional equivalent doctrine applies to any communications in MGM's privilege log, it is necessary to sort out the business and legal relationships among the parties. At the July 28, 2016 case management conference, Mr. Bice clarified the nature of these relationships. The NRA had no retained counsel in the food comp litigation. The NRA retains R&R on an ongoing basis for the legislative, lobbying and other services R&R may provide to the NRA. When the food comp litigation arose, the NRA asked R&R to assist in resolving the sales tax issue (ECF No. 481 at 11, lines 22-23). Mr. Bice represented the MGM and acknowledges that the MGM "disseminated privileged advice from its counsel to the NRA's members and R&R on a matter of common legal interest – the tax dispute with the Department [of Taxation]." *Id.* at lines 5-8. MGM contends that the inclusion of R&R

members on emails in this case does not affect the underlying privilege because R&R was the functional equivalent of an employee. *Id.* at lines 27-28 (citations omitted).

The question boils down to this: who employed R&R for purposes of claiming it is a functional equivalent of an employee? The answer is that to the extent R&R Partners is deemed the functional equivalent of an employee, its employer was the NRA, not MGM. MGM cannot assert a functional equivalent argument as to R&R because the two had no direct employer-employee relationship.

Whether this court adopts the narrower *Export-Import Bank* approach or the broader approach adopted in *Fosbre* to decide whether the functional equivalent doctrine applies here, MGM has failed to make the necessary "detailed factual showing" – if it could – to establish that R&R Partners is the functional equivalent of an employee of the NRA. *See Bieter* at 937-38; *Energy Capital Corp.* at 492. Had MGM done so, the court would then decide, based on the specific facts of this case, whether that functional equivalent protection between the NRA and R&R was encompassed into the common interest privilege between MGM and the NRA. The court need not reach this issue because MGM made no such showing here. Had MGM done so, the court would then decide, based on the specific facts of this case, whether R&R's protection as a functional equivalent employee of the NRA also entitled it to the protections of the common interest doctrine between MGM and the NRA.

MGM failed to demonstrate that R&R Partners is the functional equivalent of an employee of the NRA; therefore, the communications in the MGM privilege log that include any employee of R&R are not privileged under any anti-waiver protection, and they shall be produced to Chartwell.

### III. Conclusion

Based upon the foregoing, the court finds as follows:

1. The email communications found at Tab 1 of MGM's privilege log shall all be produced;

1  2. The attorney-client privilege protects communications between Mr. Bice and/or Mr. Holloway with MGM employees, and those documents, as described above, shall not be produced to Chartwell;

3. The common interest doctrine protects communications among MGM employees and/or counsel, and those documents, as described above, shall not be produced to Chartwell; and

4. The functional equivalent doctrine does not protect from disclosure any communications in which an R&R employee is part of the email chain, and these documents shall be produced to Chartwell no later than **Friday, August 5, 2016.**

5. Counsel for MGM shall make arrangements to have the binder of documents picked up from the court no later than **Friday, August 5, 2016** or it shall be destroyed.

**IT IS SO ORDERED**.

DATED: August 1, 2016.

_____
VALERIE P. COOKE
UNITED STATES MAGISTRATE JUDGE