1
2
3
4
5
6
7
8

9        **UNITED STATES DISTRICT COURT**

10              **DISTRICT OF NEVADA**

11   SIERRA DEVELOPMENT CO.            CASE NO. 13cv602 BEN (VPC)
                              Plaintiff,
12
                                        **ORDER GRANTING IN PART**
13                                      **MOTION FOR SUMMARY**
                                        **JUDGMENT FOR CAESARS**
14                                      **ENTERTAINMENT**
         vs.                            **CORPORATION, HARRAH'S LAS**
15                                      **VEGAS, LLC, HARRAH'S**
                                        **LAUGHLIN, LLC, AND RIO**
16                                      **PROPERTIES, LLC,**
                                        **COUNTERCLAIM DEFENDANTS,**
17                                      **AGAINST CHARTWELL**
     CHARTWELL ADVISORY GROUP,          **ADVISORY GROUP, LTD,**
18   LTD.                               **COUNTERCLAIMANT**

19                          Defendant.   [Dkt. # 530]

20   ----------------------------------------------

21   CHARTWELL ADVISORY GROUP,
     LTD.
22
                           Counterclaimant,
23
     vs.
24
     SIERRA DEVELOPMENT CO., et
25   al.,

26                         Counterdefendants.

27
28

Now before the Court is the Motion for Summary Judgment of Caesars Entertainment Corporation, Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, and Rio Properties, LLC, Counterclaim Defendants, Against Chartwell Advisory Group, Ltd, Counterclaimant.  Caesars Entertainment Corporation is not a signatory to any contract with Chartwell.  It asks to be dismissed.  That request is granted.  Chartwell has not pointed to admissible evidence that Caesars Entertainment Corporation has any contract or other legal relationship with Chartwell.  As such, its claims for breach of contract and breach of the duty of good faith and fair dealing that is a part of every contract has no basis.  Moreover, Caesars Entertainment Corporation is not a sales or use tax payer so any argument that it is unjustly enriched by virtue of Chartwell allegedly orchestrating a tax moratorium, would offer no benefit with which to be unjustly enriched.  To the extent Caesars Entertainment Corporation exercised control over a subsidiary, Caesars Entertainment Operating Company, that entity is in in bankruptcy proceedings.  An examiner's report filed in that bankruptcy proceeding is not admissible in this case for the truth of the statements made therein.  In sum, there is no evidentiary basis for any of Chartwell's counterclaims against Caesars Entertainment Corporation and it is hereby, dismissed.

Harrah's Las Vegas, LLC is the successor in interest to Harrah's Las Vegas, Inc.  Harrah's Laughlin, LLC is the successor in interest to Harrah's Laughlin, Inc.  Rio Properties, LLC is the successor in interest to Rio Properties, Inc.[1]  These three Counterclaim defendants are referred to herein as the Caesars entities.

Chartwell asserts three counterclaims against the Caesars entities in its Second Amended Answer and Counterclaim: (1) breach of contract (fourth claim), (2) breach of the duty of good faith and fair dealing (fifth claim), and (3) unjust

---

[1] *See* Motion to Dismiss Defendant/Counterclaimant Chartwell Advisory Group, Ltd's Answer, Affirmative Defenses and Counterclaims (dkt # 108, filed Feb. 21, 2014) at 8 & n. 9-12.

enrichment (sixth claim).  The Court finds there are no genuine issues of material
fact as to the first two claims and grants summary judgment to the counterclaim
defendants.  As to the unjust enrichment claim, however, genuine issues of material
fact exist.

**Background**

This case concerns taxes owed to the State of Nevada when a gaming casino
or restaurant provides a meal to a patron or an employee on a complimentary basis.
Apparently, gaming makes people hungry, because tax refund requests for use
taxes[2] paid on those complimentary meals for just the years 2001 through 2008
totaled 233 million dollars.  Chartwell, an accounting firm, saw a way early on to
argue for refunds of the use tax collected on complimentary meals.  So, Chartwell
approached these Counterclaim defendants and many other Nevada casinos with a
proposition: "Let us pursue a use tax refund for you and if we succeed, you pay us a
percentage of the tax refund."  Form contracts (titled Professional Services
Agreement) were drafted by Chartwell and signed by casino clients.  Chartwell went
to work.  Numerous use tax refund requests were submitted to the Nevada
Department of Taxation.  Lawsuits were filed to test the refund theory.  In 2008, the
Nevada Supreme Court ruled that the State of Nevada could not lawfully impose a
use tax on complimentary meals.  *See Sparks Nugget Inc. v. State of Nevada ex rel.
Dep't. of Taxation*, 179 P.3d 570 (Nev. 2008).  Chartwell cheered.

However, while closing the window on the collection of use taxes, the
Nevada Supreme Court opened a door for the collection of sales taxes on these same
complimentary meals.  *Id.* at n.15 ("Still, we do not foreclose the possibility that
complimentary meals such as the ones at issue in this case may be subject to sales

---

[2]*See e.g.*, N.R.S. 372.185 ("1. An excise tax is hereby imposed on the storage, use or other consumption in this State of tangible personal property purchased from any retailer on or after July 1, 1955, for storage, use or other consumption in this State at the rate of 2 percent of the sales price of the property.
2. The tax is imposed with respect to all property which was acquired out of state in a transaction that would have been a taxable sale if it had occurred within this State.").

tax where consideration is properly demonstrated.").  The State pushed through the new doorway.  The Nevada Department of Taxation began assessing deficiency amounts for unpaid sales tax.[3]  Because the use tax was computed on the wholesale value of the meal, while sales tax is computed on the retail value of the meal, a casino or restaurant faced an even larger sales tax liability.  Chartwell did not anticipate that tax twist.  Neither did the PSA contracts.  More litigation followed with varying results.  In 2013, a grand industry-wide settlement was reached.  Chartwell did not see that coming either.  *See* Deviney Deposition, at 154-155, Exh. 1A to Caesars entities Motion for Summary Judgment ("To jump to the chase, we never expected a settlement would take place. . . . We never envisioned that at this point in time. . . . We thought the state would ultimately agree with us or we would lose and we were wrong.").  In essence, the casinos agreed to withdraw their use tax refund requests and the Nevada Department of Taxation agreed to withdraw its sales tax deficiencies, in expectation that the Nevada legislature would pass legislation creating a sales tax moratorium on complimentary meals through the year 2019.  It was a "walk away" agreement.  Legislation was passed.  For the Caesars entities, it was now clear sailing ahead until at least 2019.  Chartwell invoiced its clients. The Caesars entities declined to pay the professional services fee.  All of this is essentially undisputed by the parties.

### Legal Standards

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing

---

[3] The use tax / sales tax dichotomy can be thought of as two sides of the same tax coin. "The Nevada use tax is complementary to the sales tax imposed on retail purchases made in this state." *Harrah's Operating Co. v. State, Dep't of Taxation*, 321 P.3d 850, 852 (Nev. 2014).

1  of legitimate inferences from the facts are jury functions, not those of a judge . . . .
2  The evidence of the non-movant is to be believed, and all justifiable inferences are
3  to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress*
4  *& Co.*, 398 U.S. 144, 157 (1970)).  However, the inferences that may be drawn are
5  not limitless.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,
6  632 (9th Cir. 1987).  Inferences must be based on specific facts and only "'rational'
7  and 'reasonable'" inferences may be drawn.  *Id.*; *United Steelworkers of Am. v.*
8  *Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

9       A moving party bears the initial burden of showing there are no genuine
10  issues of material fact.  *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th
11  Cir. 2007) (citing *T.W. Elec. Serv., Inc.*, 809 F.2d at 630).  The moving party can do
12  so by negating an essential element of the non-moving party's case, or by showing
13  that the non-moving party failed to make a showing sufficient to establish an
14  element essential to that party's case, and on which the party will bear the burden of
15  proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  As this is the
16  motion of the Counterclaim defendants, this is the approach the movants take here.

17       "Only disputes over facts that might affect the outcome of the suit under the
18  governing law will properly preclude the entry of summary judgment.  Factual
19  disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S.
20  at 248.  As a general rule, the "mere existence of a scintilla of evidence" will be
21  insufficient to raise a genuine issue of material fact; there must be evidence on
22  which the jury could reasonably find for the non-moving party.  *Id.* at 252.
23  "Summary judgment procedure is properly regarded not as a disfavored procedural
24  shortcut, but rather as an integral part of the Federal Rules as a whole, which are
25  designed 'to secure the just, speedy and inexpensive determination of every
26  action.'"  *Celotex Corp.*, 477 U.S. 327 (quoting Fed. R. Civ. P. 1).

27       **Choice of Law – Nevada State Law**
28       To determine the applicable substantive law, a federal court sitting in

- 5 -

1  diversity must apply the choice-of-law rules of the forum.  *Narayan v. EGL, Inc*.,

2  616 F.3d 895, 898 (9th Cir. 2010).  Nevada's choice-of-law principles allow parties

3  "within broad limits to choose the law that will determine the validity and effect of

4  their contract" so long as the fixed situs has a substantial relation with the

5  transaction and is not contrary to the public policy of the forum.  *Progressive Gulf*

6  *Ins. Co. v. Faehnrich*, 752 F.3d 746, 751 (9th Cir. 2014).[4]  The contracts between

7  Chartwell and the Counterclaim defendants Caesars entities provide that the law of

8  Nevada is to be applied.  Therefore, the Court finds that Nevada law applies.

9  ### Breach of Contract– the Fourth Counterclaim for Relief

10      To state a claim for breach of contract in Nevada, a plaintiff must

11  demonstrate: (1) the existence of a valid contract; (2) that plaintiff performed or was

12  excused from performance; (3) that the defendant breached the contract; and (4) that

13  the plaintiff sustained damages.  *Calloway v. City of Reno*, 1993 P.2d 1259, 1263

14  (2000).  Interpreting an unambiguous contract is generally a question of law.

15  *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013).  In Nevada,

16  contractual construction is a question of law and "suitable for determination by

17  summary judgment."  *Ellison v. California State Auto. Ass'n*, 797 P.2d 975, 977

18  (Nev. 1990).  "It has long been the policy in Nevada that absent some

19  countervailing reason, contracts will be construed from the written language and

20  enforced as written."  *Id.*  On the other hand, summary judgment is improper if the

21  court must use extrinsic evidence to determine the meaning of an ambiguous term

22  within the contract.  *Dickenson v. State, Dep't of Wildlife*, 877 P.2d 1059, 1061

23  (Nev. 1994).

24      A contract is ambiguous if its terms may reasonably be interpreted in more

25

26  [4]In the absence of a contract provision, Nevada courts apply the "substantial relationship" test.  *Consol. Generator–Nev., Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1253 (Nev. 1998).  To determine whether a state has a substantial relationship

27  with a contract, a court considers the following five factors: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance;

28  (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.  *Id.* at 1253–54.

than one way, but ambiguity does not arise simply because the parties disagree on how to interpret their contract." *Galardi*, 301 P.3d at 366. "Rather, an ambiguous contract is an agreement obscure in meaning, through indefiniteness of expression or having a double meaning." *Id.* (internal quotation marks omitted). In other words, once this Court initially determines that "the language of the contract is clear and unambiguous, the contract is enforced as written." *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015). "[I]f no ambiguity exists, the words of the contract must be taken in their usual and ordinary signification." *Traffic Control Servs., Inc. v. United Rentals Nw., Inc.*, 87 P.3d 1054, 1059 (Nev. 2004) (internal quotation marks omitted).

According to the ordinary significance of the terms of the contract, Chartwell would earn a fee equal to a percentage of the "Total Refund" recovered by the casino client. For example, in the PSA between Chartwell and Harrah's Las Vegas, Inc. (dated Feb. 10, 2004), Article 4.A states that: "Chartwell's fee for services rendered to Client shall be twenty percent (20%) of the Total Refund for complimentary food items." "Total Refund" is defined in Article 1.H as follows: "*The Total Refund shall include all refunded sales and use taxes, interest and penalties for complimentary food items filed as a result of the efforts of Chartwell.*"

"Refund" has a plain meaning. According to Black's Law Dictionary (Ninth edition), the first meaning of the term "refund" is: "the return of money to a person who overpaid, such as a taxpayer who overestimated tax liability or whose employer withheld too much tax from earnings." The second meaning is similar: "the money returned to a person who overpaid." A refund is a return of money. This much is plain. And because it is plain, the term may be interpreted by a court without resort to extrinsic evidence. A tax refund of a fixed amount of money is the basis upon which the professional services fee was to be calculated: "*Chartwell's fee for services . . . shall be twenty percent (20%) of the Total Refund for complimentary food items.*" Without a tax refund of a specific amount, there was no fee to be

1  calculated.  This is a typical agreement with typical contingency fee terms based on

2  a typical expectation of likely events.  The contract makes clear that Chartwell's fee

3  is dependent upon recovering refund money for its client: "*It is understood and*

4  *agreed that the services rendered by Chartwell are upon a contingent fee basis and,*

5  *if no amounts are recoverable, Client shall not be indebted to Chartwell for any*

6  *fees or costs whatsoever.*"  Article 2.B.

7       The evidence is undisputed as to the Caesars entities that none received a tax

8  refund in the form of money returned or even a formal credit against future taxes.

9  What they did receive is the benefit of a sales and use tax moratorium until at least

10  2019.  Whether that benefit was due to Chartwell's efforts or independent actors and

11  events, or a mixture of both, is the subject of the unjust enrichment claim. The

12  benefit may be worth a significant amount of money.  A tax moratorium though,

13  however beneficial, is not encompassed within the contract definition of a Total

14  Refund.  Because no tax refund was received in the form of money or credit, no fee

15  for services was due under the agreement.

16       Chartwell offers no evidence to the contrary.  Instead, it argues that the

17  *economic reality* is the equivalent of a refund; that its efforts to pursue use tax

18  refunds, and the resulting events that culminated in the industry-wide settlement

19  agreement and tax moratorium, changed reality such that these Counterclaim

20  defendants did receive a refund.  It is the economic equivalent of a refund upon

21  which their fees are due, according to Chartwell.  While it may be an economic

22  reality, this type of a "refund" is beyond the contract definition of the "Total

23  Refund."  The legal reality is that the Counterclaim defendants did not receive a

24  refund of use or sales taxes paid on complimentary meals.  Because they received

25  no money refund, no genuine issue of material fact remains.  No professional

26  services fee was earned.

27       Chartwell advances several arguments to the contrary.  First, it argues that the

28  Caesars entities exchanged their right to a money refund for legislative relief.  But it

1   was never finally determined that the Caesars entities were entitled to a cash tax

2   refund of any amount.  What it did exchange is the uncertainty of litigation over use

3   vs. sales taxation on complimentary meals, on the one hand, for the certainty of no

4   additional liability looking backward or looking forward at least until 2019.

5         Chartwell simply argues that the *Sparks Nugget* decision required the

6   Department of Taxation to pay the use tax refund to the Caesars entities.[5]  But with

7   this argument, Chartwell overlooks the significance of the Department of Taxation's

8   deficiency assessments for unpaid sales tax.  Where Chartwell's client wins the right

9   to a use tax refund, but as a result faces an equal or larger sales tax liability, it

10  cannot be said that the client received any benefit of the contracted-for bargain.  To

11  interpret the professional services fee provision based on only one side of the

12  taxation equation would clearly render the contractual promise illusory.  Obviously,

13  obtaining a refund right, only to face an equal or greater tax liability, against which

14  the refund will be offset, would gain nothing for the Caesars entities.  That

15  Chartwell would ask to be paid for obtaining such a result would have as its basis an

16  unenforceable illusory promise.  The illusory promises doctrine "instructs courts to

17  avoid constructions of contracts that would render promises illusory because such

18  promises cannot serve as consideration for a contract."  *M & G Polymers USA, LLC*

19  *v. Tackett*, 135 S. Ct. 926, 936 (2015) (citing 3 Williston § 7:7 (4th ed. 2008)).  That

20  the Department of Taxation would offset a use tax refund against its concomitant

21  sales tax deficiency was no pipe dream.  In Harrah's litigation against the State, the

22  Nevada state district court ruled that "the State can offset any refund of use tax due

23  to Harrah's with sales tax that was imposed pursuant to a timely deficiency

24  determination."  *Harrah's Entertainment Inc. Group, et al. v. Nevada, et al.*, slip op.

25  at *7, Case No. 12 C 264 1B (1st Judicial District Court of Nevada Apr. 25, 2013)

26

27      [5]The argument oversimplifies the legal questions facing the courts.  *See e.g.*,
    *Sparks Nugget,* 179 P.3d 570 at n.31 ("Moreover, this case is far more complex than

28  the dissent suggests because it requires not only our interpretation of Nevada's
    constitutional directive exempting food from use taxation, but also our understanding
    of the ever-elusive use tax's application.").

(Tab "I," Chartwell's Combined Appendix).  Consequently, any potential right to a use tax refund for the Caesars entities had potentially little or no value.  Whatever value it had, it was not contemplated by the contract.  If it were included in the terms of the contract (which it is not), it would be an unenforceable illusory contract term.

Chartwell also argues that this Court has already ruled that the term "refund" is ambiguous in the ruling on the motion to dismiss by the Hon. Richard F. Boulware, II. (p. 22:5-11, Tab "O," Chartwell's Combined Appendix).  However, that ruling concerned whether it was at least plausible that the settlement agreement benefits constituted a refund.  It was a plausible theory.  However, it was a conclusion without the benefit of an evidentiary record.  That ruling for purposes of a motion to dismiss does not bind the Court now for summary judgment.  *Moonin v. Nevada ex rel. Dept. of Public Safety Highway Patrol*, 2015 WL 4113289, *6 (D. Nev. 2015) (citing *Pearson v. Dennison*, 353 F.2d 24, 28 (9th Cir.1965)).  Now, it is clear that there is no evidence to support the theory.  There is no evidence that the contract contains other terms that state or imply that a settlement agreement and a future tax moratorium would be included in the contractual concept of a Total Refund.

The motion for summary judgment is granted on the breach of contract claim in favor of the Caesars entities.

**Breach of the Duty of Good Faith and Fair Dealing – the Fifth Counterclaim for Relief**

Every contract in Nevada contains an implied duty of good faith and fair dealing and essentially forbids arbitrary, unfair acts by one party that disadvantage the other.  *Frantz v. Johnson*, 999 P.2d 351, 362 n. 4 (Nev. 2000); *Hilton Hotels, Inc. v. Butch Lewis Prods.*, 862 P.2d 1207, 1209 (Nev. 1993).  "A breach of the covenant arises where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the

1   contract." *Gunter v. United Fed. Credit Union*, No. 15cv483-MMD-WGC, 2016

2   WL 3457009, at *2 (D. Nev. June 22, 2016) (citation omitted).

3       Chartwell asserts that the Caesars entities evaded the spirit of the contract and

4   interfered with Chartwell's performance.  Specifically, the Caesars entities did so by

5   settling the refund claims with the Department of Taxation.  In Chartwell's view,

6   the settlement relieved the State from making a cash payment but allowed the

7   Caesars entities to realize the economic value of Chartwell's work.

8       In support of its claim, Chartwell points to Exhibit 19, Exhibit 30, and the

9   Floyd deposition (pgs. 257-263).  Exhibit 19 is a memorandum from Carol Tabrizi.

10  It notes there are potential gains and losses of continuing the use tax refunds and

11  sales tax fights.  It describes the uncertainties.  It notes that use tax refunds had not

12  yet been received.  Exhibit 30 simply indicates one writer's displeasure that some of

13  Chartwell's clients appeared to be benefitting more than other businesses.  The

14  Floyd deposition simply provides commentary about Exhibit 19.  It notes that

15  Chartwell might be due professional services fees in the event refunds were to be

16  actually received.

17      The problem with Chartwell's argument is that the settlement was desired by

18  the State of Nevada, encouraged by Chartwell (as suggested by Exh. 30), and

19  required the independent approval of the state legislature in the form of tax

20  moratorium legislation.  The State of Nevada desired a global settlement of all use

21  tax refund cases.  The legality of imposing sales tax deficiencies to offset use tax

22  refunds was uncertain.  Test cases had been instituted and decisions had been issued

23  at the trial court level.  The Nevada appellate courts had yet to weigh in.  Statute of

24  limitations issues existed.  The State of Nevada might have ultimately won approval

25  of its sales tax deficiency program.  In that case it would have traded the right to

26  collect use taxes for the right to impose even higher sales taxes and completely

27  offset any refund liability.  Or it could have lost.  (After all, justifying a sales tax on

28  a meal that is given away is not the most robust taxation theory.)  Had the state lost

in the appellate courts, the 233 million dollar use tax refund liability would remain and would have grown even larger due to accumulating interest over time.

Instead of upping the ante on a high stakes legal bet, the State of Nevada sought to settle the uncertainty of the past taxation issues.  To make it work, the casinos withdrew their use tax claims and the State withdrew its sales tax deficiency claims and its right to offset one against the other.  Perhaps the casinos were more willing to gamble on a favorable outcome in the appellate courts, so the State offered additional value.  The Governor's Office used its persuasion on the Legislature to pass a tax moratorium until 2019.  That offered potential value to the casinos and restaurants going forward, making the global settlement more attractive.  In short, it was a global settlement at the instigation of the State.  It required the agreement of the State.  It required legislation to be considered and passed by the Legislature.  There is no evidence that it was a settlement at the instigation of the Caesars entities.  Nor is there evidence that it was something the Caesars entities could have accomplished on their own just to frustrate Chartwell's ability to collect its contingency fee.  There is no evidence that demonstrates the Caesars entities evaded the spirit of the Chartwell contracts or interfered with Chartwell's performance.

Finally, the contracts provided that the Caesars entities were free to stop pursuing use tax refunds at any time without owing Chartwell a fee.  They did that.  The Caesars entities exercised their contractual right to terminate the contracts *in 2008* – long before signing the settlement agreement with the State.  (Second Amended Answer and Counterclaim, at paragraph 88; Exh 32, Index of Documents submitted in support of Caesars entities motion.)  There is no genunine issue of material fact to support Chartwell's claim of breach of the duty of good faith and fair dealing.  The motion for summary judgment is granted on the breach of the duty of good faith and fair dealing in favor of the Caesars entities.

**Unjust Enrichment – the Sixth Counterclaim for Relief**

1        Unjust enrichment occurs when one party confers a benefit on a second party
2   which accepts and retains the benefit under circumstances such that it would be
3   inequitable to retain the benefit without paying for its value. *Certified Fire Prot.*
4   *Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012) ("Unjust enrichment exists
5   when the plaintiff confers a benefit on the defendant, the defendant appreciates such
6   benefit, and there is acceptance and retention by the defendant of such benefit under
7   circumstances such that it would be inequitable for him to retain the benefit without
8   payment of the value thereof."). It reaches beyond retention of money. *Id.* (The
9   benefit "can include services beneficial to or at the request of the other, denotes any
10  form of advantage, and is not confined to retention of money or property."). "The
11  doctrine of unjust enrichment or recovery in quasi contract applies to situations
12  where there is no legal contract but where the person sought to be charged is in
13  possession of money or property which in good conscience and justice he should
14  not retain but should deliver to another or should pay for." *Leasepartners Corp. v.*
15  *Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997)
16  (quoting 66 Am. Jur. 2d *Restitution* § 11 (1973)). Here, there is evidence that the
17  tax moratorium is a valuable benefit enjoyed by the Caesars entities, conferred upon
18  them at least in part by Chartwell's work in pursuing use tax refunds industry wide,
19  pursuing litigation favorable to casinos, and assisting the State of Nevada in
20  structuring a global settlement and persuading the manifold casinos with refund
21  claims to accept the settlement.
22       The Caesars entities argue that Chartwell cannot pursue the unjust enrichment
23  claim as a matter of law where there is also an existing contract. *McKesson HBOC,*
24  *Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir.
25  2003) (a party cannot seek recovery under an unjust enrichment theory if a contract
26  is the measure of the plaintiff's right); *Leasepartners Corp.*, 942 P.2d at 187 (action
27  based on theory of unjust enrichment not available where there is an express,
28  written contract, because no agreement can be implied when the agreement is

express).  Chartwell argues that Nevada courts permit unjust enrichment claims where a contract has expired, or where the benefit conferred was different from the benefit for which the contract was formed.  Here, it appears Nevada law would permit an unjust enrichment claim since the benefit conferred (the industry-wide pursuit of tax relief, the facilitation of a global settlement agreement, and the resulting multi-year tax moratorium) was vastly different in scope and kind from the contracted-for benefit of a tax refund for only the Caesars entities.

Undeterred, the Caesars entities argue that the four-year statute of limitations on unjust enrichment claims bars the Chartwell claim.  "The statute of limitation for an unjust enrichment claim is four years."  *In re Amerco Derivative Litig.*, 228, 252 P.3d 681, 703 (Nev. 2011) (citing NRS 11.190(2)(c)).  They argue that the limitations period should run from 2008 when Chartwell argues that it became entitled to the contracted professional services fee.  It is the movant's burden to demonstrate the absence of a genuine issue of material fact as to when a party should have discovered the facts underlying its claim when the movant is seeking summary judgment on grounds of a statute of limitations.  *Oak Grove Inv'rs v. Bell & Gossett Co.,* 668 P.2d 1075, 1079 (Nev. 1983), *disapproved on other grounds by Calloway v. City of Reno*, 993 P.2d 1259 (Nev. 2000).  "Determinations as to the time when a plaintiff knew or should have known of [the basis for his claim], and the time when a plaintiff suffered damages . . . are questions of fact for the trier of fact."  *Havas v. Engebregson*, 633 P.2d 682, 684 (Nev. 1981); *In re Amerco Derivative Litig.*, 228, 252 P.3d at 703 ("A determination of when the plaintiff knew or in the exercise of proper diligence should have known of the facts constituting the elements of his cause of action is a question of fact for the trier of fact.") (internal quotations and citations omitted).  Chartwell does not assert that this is the triggering date for the unjust enrichment claim.  For the unjust enrichment claim, there is substantial evidence that the benefit allegedly conferred and retained was the result of the State settlement agreement which took place in 2013.  The unjust

1   enrichment claim was also filed in 2013.  Thus, the Caesars entities are not entitled

2   to summary judgment based upon the claim being barred by the statute of

3   limitations.

4       The evidence creates genuine issues of material fact concerning whether the

5   Caesars entities received a valuable benefit in the form of the State settlement

6   agreement and tax moratorium conferred upon them by the efforts of Chartwell and

7   for which it would be unjust to retain without payment to Chartwell.   The motion

8   for summary judgment is denied on the unjust enrichment claim against the Caesars

9   entities.

10      **Conclusion**

11      Summary judgment is granted in favor of the Counterclaim defendants

12  Caesars entities on the Fourth and Fifth Counterclaims based on contract.  Summary

13  judgment is denied on the Sixth Counterclaim based on unjust enrichment.  Caesars

14  Entertainment Corporation is dismissed as a Counterclaim defendant.

15  DATED:  December 14, 2016

16  _____

17  Hon. Roger T. Benitez
    United States District Judge

18

19

20

21

22

23

24

25

26

27

28