1
2
3
4
5
6
7
8
9                **UNITED STATES DISTRICT COURT**
10                     **DISTRICT OF NEVADA**

| | |
|---|---|
| SIERRA DEVELOPMENT CO. <br>                   Plaintiff, <br><br><br>     vs. <br><br><br><br> CHARTWELL ADVISORY GROUP, LTD. <br>                Defendant. <br> ------------------------------------------------ <br> CHARTWELL ADVISORY GROUP, LTD. <br>             Counterclaimant, <br> vs. <br> SIERRA DEVELOPMENT CO., et al., <br>          Counterdefendants. | CASE NO. 13cv602 BEN (VPC) <br><br> **ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT FOR GOLDEN NUGGET, INC., GNLV. CORP., AND GOLDEN NUGGET HOTELS AND CASINOS COUNTERCLAIM DEFENDANTS, AGAINST CHARTWELL ADVISORY GROUP, LTD, COUNTERCLAIMANT** <br><br> [Dkt. # 528] |

1   Now before the Court is the Motion for Summary Judgment of Golden
2   Nugget, Inc., GNLV Corp., and Golden Nugget Hotels and Casinos, Counterclaim
3   Defendants, against Chartwell Advisory Group, Ltd, Counterclaimant.  These three
4   Counterclaim defendants are referred to herein as the Golden Nugget entities.
5   Chartwell asserts three counterclaims against the Golden Nugget entities in its
6   Second Amended Answer and Counterclaim: (1) breach of contract (thirteenth
7   claim), (2) breach of the duty of good faith and fair dealing (fourteenth claim), and
8   (3) unjust enrichment (fifteenth claim).  The Court finds there are no genuine issues
9   of material fact as to the first two claims and grants summary judgment to the
10   Counterclaim defendants.  As to the unjust enrichment claim, however, genuine
11   issues of material fact exist.

12   **Background**

13   This case concerns taxes owed to the State of Nevada when a gaming casino
14   or restaurant provides a meal to a patron or an employee on a complimentary basis.
15   Apparently, gaming makes people hungry, because tax refund requests for use taxes[1]
16   paid on those complimentary meals for just the years 2001 through 2008 totaled 233
17   million dollars.  Chartwell, an accounting firm, saw a way early on to argue for
18   refunds of the use tax collected on complimentary meals.  So, Chartwell approached
19   these Counterclaim defendants and many other Nevada casinos with a proposition:
20   "Let us pursue a use tax refund for you and if we succeed, you pay us a percentage
21   of the tax refund."  Form contracts (titled Professional Services Agreement) were
22   drafted by Chartwell and signed by casino clients.  Chartwell went to work.
23   Numerous use tax refund requests were submitted to the Nevada Department of
24   Taxation.  Lawsuits were filed to test the refund theory.  In 2008, the Nevada
25

26   [1]*See e.g.*, N.R.S. 372.185 ("1. An excise tax is hereby imposed on the storage, use
27   or other consumption in this State of tangible personal property purchased from any
     retailer on or after July 1, 1955, for storage, use or other consumption in this State at the
     rate of 2 percent of the sales price of the property.
28   2. The tax is imposed with respect to all property which was acquired out of state in a
     transaction that would have been a taxable sale if it had occurred within this State.").

Supreme Court ruled that the State of Nevada could not lawfully impose a use tax on complimentary meals. *See Sparks Nugget Inc. v. State of Nevada ex rel. Dep't. of Taxation*, 179 P.3d 570 (Nev. 2008). Chartwell cheered.

However, while closing the window on the collection of use taxes, the Nevada Supreme Court opened a door for the collection of sales taxes on these same complimentary meals. *Id.* at n.15 ("Still, we do not foreclose the possibility that complimentary meals such as the ones at issue in this case may be subject to sales tax where consideration is properly demonstrated."). The State pushed through the new doorway. The Nevada Department of Taxation began assessing deficiency amounts for unpaid sales tax.[2] Because the use tax was computed on the wholesale value of the meal, while sales tax is computed on the retail value of the meal, a casino or restaurant faced an even larger sales tax liability. Chartwell did not anticipate that tax twist. Neither did the PSA contracts. More litigation followed with varying results. In 2013, a grand industry-wide settlement was reached. Chartwell did not see that coming either. *See* Deviney Deposition, at 154-155, Exh. 1A to Golden Nugget entities Motion for Summary Judgment ("To jump to the chase, we never expected a settlement would take place. . . . We never envisioned that at this point in time. . . . We thought the state would ultimately agree with us or we would lose and we were wrong."). In essence, the casinos agreed to withdraw their use tax refund requests and the Nevada Department of Taxation agreed to withdraw its sales tax deficiencies, in expectation that the Nevada legislature would pass legislation creating a sales tax moratorium on complimentary meals through the year 2019. It was a "walk away" agreement. Legislation was passed. For the Golden Nugget entities, it was now clear sailing ahead until at least 2019. Chartwell

---

[2] The use tax / sales tax dichotomy can be thought of as two sides of the same tax coin. "The Nevada use tax is complementary to the sales tax imposed on retail purchases made in this state." *Harrah's Operating Co. v. State, Dep't of Taxation*, 321 P.3d 850, 852 (Nev. 2014).

1  invoiced its clients. The Golden Nugget entities declined to pay the professional

2  services fee.  All of this is essentially undisputed by the parties.

3  **Legal Standards**

4  Summary judgment is appropriate when "there is no genuine dispute as to any

5  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

6  P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

7  "Credibility determinations, the weighing of the evidence, and the drawing of

8  legitimate inferences from the facts are jury functions, not those of a judge . . . .  The

9  evidence of the non-movant is to be believed, and all justifiable inferences are to be

10  drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*,

11  398 U.S. 144, 157 (1970)).  However, the inferences that may be drawn are not

12  limitless.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632

13  (9th Cir. 1987).  Inferences must be based on specific facts and only "'rational' and

14  'reasonable'" inferences may be drawn.  *Id.*; *United Steelworkers of Am. v. Phelps*

15  *Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

16  A moving party bears the initial burden of showing there are no genuine

17  issues of material fact.  *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th

18  Cir. 2007) (citing *T.W. Elec. Serv., Inc.*, 809 F.2d at 630).  The moving party can do

19  so by negating an essential element of the non-moving party's case, or by showing

20  that the non-moving party failed to make a showing sufficient to establish an

21  element essential to that party's case, and on which the party will bear the burden of

22  proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  As this is the

23  motion of the Counterclaim defendants, this is the approach the movants take here.

24  "Only disputes over facts that might affect the outcome of the suit under the

25  governing law will properly preclude the entry of summary judgment.  Factual

26  disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S.

27  at 248.  As a general rule, the "mere existence of a scintilla of evidence" will be

28  insufficient to raise a genuine issue of material fact; there must be evidence on

1    which the jury could reasonably find for the non-moving party. *Id.* at 252.

2    "Summary judgment procedure is properly regarded not as a disfavored procedural

3    shortcut, but rather as an integral part of the Federal Rules as a whole, which are

4    designed 'to secure the just, speedy and inexpensive determination of every action.'"

5    *Celotex Corp.*, 477 U.S. 327 (quoting Fed. R. Civ. P. 1).

6               **Choice of Law – Nevada State Law**

7               To determine the applicable substantive law, a federal court sitting in diversity

8    must apply the choice-of-law rules of the forum. *Narayan v. EGL, Inc*., 616 F.3d

9    895, 898 (9th Cir. 2010). Nevada's choice-of-law principles allow parties "within

10   broad limits to choose the law that will determine the validity and effect of their

11   contract" so long as the fixed situs has a substantial relation with the transaction and

12   is not contrary to the public policy of the forum. *Progressive Gulf Ins. Co. v.

13   Faehnrich*, 752 F.3d 746, 751 (9th Cir. 2014).[3]  The contracts between Chartwell

14   and the Counterclaim defendants Golden Nugget entities provide that the law of

15   Pennsylvania is to be applied. However, Pennsylvania has a modest relationship the

16   controversy.   All of the substantial events took place in and with the State of

17   Nevada. Therefore, the Court finds that Nevada law applies.

18           **Breach of Contract– the Thirteenth Counterclaim for Relief**

19           To state a claim for breach of contract in Nevada, a plaintiff must

20   demonstrate: (1) the existence of a valid contract; (2) that plaintiff performed or was

21   excused from performance; (3) that the defendant breached the contract; and (4) that

22   the plaintiff sustained damages. *Calloway v. City of Reno*, 1993 P.2d 1259, 1263

23   (2000). Interpreting an unambiguous contract is generally a question of law.

24   *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013). In Nevada,

25   _____

26           [3]In the absence of a contract provision, Nevada courts apply the "substantial
     relationship" test. *Consol. Generator–Nev., Inc. v. Cummins Engine Co.*, 971 P.2d
27   1251, 1253 (Nev. 1998).  To determine whether a state has a substantial relationship
     with a contract, a court considers the following five factors: (1) the place of contracting;
28   (2) the place of negotiation of the contract; (3) the place of performance; (4) the
     location of the subject matter of the contract; and (5) the domicile, residence,
     nationality, place of incorporation, and place of business of the parties. *Id.* at 1253–54.

1   contractual construction is a question of law and "suitable for determination by

2   summary judgment." *Ellison v. California State Auto. Ass'n*, 797 P.2d 975, 977

3   (Nev. 1990). "It has long been the policy in Nevada that absent some countervailing

4   reason, contracts will be construed from the written language and enforced as

5   written." *Id.* On the other hand, summary judgment is improper if the court must

6   use extrinsic evidence to determine the meaning of an ambiguous term within the

7   contract. *Dickenson v. State, Dep't of Wildlife*, 877 P.2d 1059, 1061 (Nev. 1994).

8       A contract is ambiguous if its terms may reasonably be interpreted in more

9   than one way, but ambiguity does not arise simply because the parties disagree on

10  how to interpret their contract." *Galardi*, 301 P.3d at 366. "Rather, an ambiguous

11  contract is an agreement obscure in meaning, through indefiniteness of expression or

12  having a double meaning." *Id.* (internal quotation marks omitted). In other words,

13  once this Court initially determines that "the language of the contract is clear and

14  unambiguous, the contract is enforced as written." *Am. First Fed. Credit Union v.*

15  *Soro*, 359 P.3d 105, 106 (Nev. 2015). "[I]f no ambiguity exists, the words of the

16  contract must be taken in their usual and ordinary signification." *Traffic Control*

17  *Servs., Inc. v. United Rentals Nw., Inc.*, 87 P.3d 1054, 1059 (Nev. 2004) (internal

18  quotation marks omitted).

19      According to the ordinary significance of the terms of the contract, Chartwell

20  would earn a fee equal to a percentage of the "Total Refund" recovered by the casino

21  client. For example, in the PSA between Chartwell and Golden Nugget Las Vegas

22  (dated October 7, 2004), Article 4.A states that: *"For complimentary items,*

23  *Chartwell's fee for services rendered to Client shall be twenty-five percent (25%) of*

24  *the Total Refund obtained directly as a result of the petitions prepared by*

25  *Chartwell."* "Total Refund" is defined in Article 1.G as follows: *"The Total Refund*

26  *shall include all sales and use, hotel, business . . . taxes, plus interest and penalties*

27  *refunded as a result of the efforts of Chartwell."*

28      "Refund" has a plain meaning. According to Black's Law Dictionary (Ninth

edition), the first meaning of the term "refund" is: "the return of money to a person who overpaid, such as a taxpayer who overestimated tax liability or whose employer withheld too much tax from earnings."  The second meaning is similar: "the money returned to a person who overpaid."  A refund is a return of money.  This much is plain.  And because it is plain, the term may be interpreted by a court without resort to extrinsic evidence.  A tax refund of a fixed amount of money is the basis upon which the professional services fee was to be calculated: "*Chartwell's fee for services shall be twenty-five percent (25%) of the Total Refund obtained directly . . . .*"  Without a tax refund of a specific amount, there was no fee to be calculated.  This is a typical agreement with typical contingency fee terms based on a typical expectation of likely events.  The contract makes clear that Chartwell's fee is dependent upon recovering refund money for its client: "*It is understood and agreed that the services rendered by Chartwell are upon a contingent fee basis and, if no amounts are recoverable, Client shall not be indebted to Chartwell for any fees or costs whatsoever.*"  Article 2.B.

The evidence is undisputed as to the Golden Nugget entities that none received a tax refund for gaming-related[4] complimentary food in the form of money returned or even a formal credit against future taxes.  What they did receive is the benefit of a sales and use tax moratorium until at least 2019.  Whether that benefit was due to Chartwell's efforts or independent actors and events, or a mixture of both, is the subject of the unjust enrichment claim.  The benefit may be worth a significant amount of money.  A tax moratorium though, however beneficial, is not encompassed within the contract definition of a Total Refund.  Because no tax refund was received in the form of money or credit, no fee for services was due under the agreement.

Chartwell offers no evidence to the contrary.  Instead, it argues that the

---

[4]Golden Nugget does not dispute the receipt of a tax credit for non-gaming complimentary meals in the amount of $492,605.  It is not the subject of this motion.

1  *economic reality* is the equivalent of a refund; that its efforts to pursue use tax

2  refunds, and the resulting events that culminated in the industry-wide settlement

3  agreement and tax moratorium, changed reality such that these Counterclaim

4  defendants did receive a refund.  It is the economic equivalent of a refund upon

5  which their fees are due, according to Chartwell.  While it may be an economic

6  reality, this type of a "refund" is beyond the contract definition of the "Total

7  Refund."  The legal reality is that the Counterclaim defendants did not receive a

8  refund of use or sales taxes paid on gaming-related complimentary meals.  Because

9  they received no money refund, no genuine issue of material fact remains.  No

10  professional services fee was earned.

11       Chartwell advances several arguments to the contrary.  First, it argues that the

12  Golden Nugget entities exchanged their right to a money refund for legislative relief.

13  But it was never finally determined that the Golden Nugget entities were entitled to a

14  cash tax refund of any amount.  What it did exchange is the uncertainty of litigation

15  over use vs. sales taxation on gaming-related complimentary meals, on the one hand,

16  for the certainty of no additional liability looking backward or looking forward at

17  least until 2019.

18       Chartwell simply argues that the *Sparks Nugget* decision required the

19  Department of Taxation to pay the use tax refund to the Golden Nugget entities.[5]

20  But with this argument, Chartwell overlooks the significance of the Department of

21  Taxation's deficiency assessments for unpaid sales tax.  Where Chartwell's client

22  wins the right to a use tax refund, but as a result faces an equal or larger sales tax

23  liability, it cannot be said that the client received any benefit of the contracted-for

24  bargain.  To interpret the professional services fee provision based on only one side

25  of the taxation equation would clearly render the contractual promise illusory.

26

27       [5]The argument oversimplifies the legal questions facing the courts.  *See e.g.*, *Sparks Nugget,* 179 P.3d 570 at n.31 ("Moreover, this case is far more complex than the

28  dissent suggests because it requires not only our interpretation of Nevada's constitutional directive exempting food from use taxation, but also our understanding of the ever-elusive use tax's application.").

1    Obviously, obtaining a refund right, only to face an equal or greater tax liability,

2    against which the refund will be offset, would gain nothing for the Golden Nugget

3    entities.  That Chartwell would ask to be paid for obtaining such a result would have

4    as its basis an unenforceable illusory promise.  The illusory promises doctrine

5    "instructs courts to avoid constructions of contracts that would render promises

6    illusory because such promises cannot serve as consideration for a contract."  *M & G*

7    *Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 936 (2015) (citing 3 Williston § 7:7

8    (4th ed. 2008)).  That the Department of Taxation would offset a use tax refund

9    against its concomitant sales tax deficiency was no pipe dream.  In Harrah's

10   litigation against the State, the Nevada state district court ruled that "the State can

11   offset any refund of use tax due to Harrah's with sales tax that was imposed pursuant

12   to a timely deficiency determination."  *Harrah's Entertainment Inc. Group, et al. v.*

13   *Nevada, et al.*, slip op. at *7, Case No. 12 C 264 1B (1st Judicial District Court of

14   Nevada Apr. 25, 2013) (Tab "I," Chartwell's Combined Appendix).  Consequently,

15   any potential right to a use tax refund for the Golden Nugget entities had potentially

16   little or no value.  Whatever value it had, it was not contemplated by the contract.  If

17   it were included in the terms of the contract (which it is not), it would be an

18   unenforceable illusory contract term.

19       Chartwell also argues that this Court has already ruled that the term "refund"

20   is ambiguous in the ruling on the motion to dismiss by the Hon. Richard F.

21   Boulware, II. (p. 22:5-11, Tab "O," Chartwell's Combined Appendix).  However,

22   that ruling concerned whether it was at least plausible that the settlement agreement

23   benefits constituted a refund.  It was a plausible theory.  However, it was a

24   conclusion without the benefit of an evidentiary record.  That ruling for purposes of

25   a motion to dismiss does not bind the Court now for summary judgment.  *Moonin v.*

26   *Nevada ex rel. Dept. of Public Safety Highway Patrol*, 2015 WL 4113289, *6 (D.

27   Nev. 2015) (citing *Pearson v. Dennison*, 353 F.2d 24, 28 (9th Cir.1965)).  Now, it is

28   clear that there is no evidence to support the theory.  There is no evidence that the

contract contains other terms that state or imply that a settlement agreement and a future tax moratorium would be included in the contractual concept of a Total Refund.

The motion for summary judgment is granted on the breach of contract claim in favor of the Golden Nugget entities.

**Breach of the Duty of Good Faith and Fair Dealing – the Fourteenth Counterclaim for Relief**

Every contract in Nevada contains an implied duty of good faith and fair dealing and essentially forbids arbitrary, unfair acts by one party that disadvantage the other.  *Frantz v. Johnson*, 999 P.2d 351, 362 n. 4 (Nev. 2000); *Hilton Hotels, Inc. v. Butch Lewis Prods.*, 862 P.2d 1207, 1209 (Nev. 1993).  "A breach of the covenant arises where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." *Gunter v. United Fed. Credit Union*, No. 15cv483-MMD-WGC, 2016 WL 3457009, at *2 (D. Nev. June 22, 2016) (citation omitted).

Chartwell asserts that the Golden Nugget entities evaded the spirit of the contract and interfered with Chartwell's performance.  Specifically, the Golden Nugget entities did so by settling the refund claims with the Department of Taxation. In Chartwell's view, the settlement relieved the State from making a cash payment but allowed the Golden Nugget entities to realize the economic value of Chartwell's work.

In support of its claim, Chartwell points to no particular bit of evidence. The problem with Chartwell's argument is that the settlement was desired by the State of Nevada, encouraged by Chartwell (as suggested by Exh. 30), and required the independent approval of the state legislature in the form of tax moratorium legislation.  The State of Nevada desired a global settlement of all use tax refund cases.  The legality of imposing sales tax deficiencies to offset use tax refunds was uncertain.  Test cases had been instituted and decisions had been issued at the trial

court level.  The Nevada appellate courts had yet to weigh in.  Statute of limitations issues existed.  The State of Nevada might have ultimately won approval of its sales tax deficiency program.  In that case it would have traded the right to collect use taxes for the right to impose even higher sales taxes and completely offset any refund liability.  Or it could have lost.  (After all, justifying a sales tax on a meal that is given away is not the most robust taxation theory.)  Had the state lost in the appellate courts, the 233 million dollar use tax refund liability would remain and would have grown even larger due to accumulating interest over time.

Instead of upping the ante on a high stakes legal bet, the State of Nevada sought to settle the uncertainty of the past taxation issues.  To make it work, the casinos withdrew their use tax claims and the State withdrew its sales tax deficiency claims and its right to offset one against the other.  Perhaps the casinos were more willing to gamble on a favorable outcome in the appellate courts, so the State offered additional value.  The Governor's Office used its persuasion on the Legislature to pass a tax moratorium until 2019.  That offered potential value to the casinos and restaurants going forward, making the global settlement more attractive.  In short, it was a global settlement at the instigation of the State.  It required the agreement of the State.  It required legislation to be considered and passed by the Legislature. There is no evidence that it was a settlement at the instigation of the Golden Nugget entities.  Nor is there evidence that it was something the Golden Nugget entities could have accomplished on their own just to frustrate Chartwell's ability to collect its contingency fee.  There is no evidence that demonstrates the Golden Nugget entities evaded the spirit of the Chartwell contracts or interfered with Chartwell's performance.

Finally, the contracts provided that the Golden Nugget entities were free to stop pursuing use tax refunds at any time without owing Chartwell a fee.   There is no genuine issue of material fact to support Chartwell's claim of breach of the duty of good faith and fair dealing.  The motion for summary judgment is granted on the

1  breach of the duty of good faith and fair dealing in favor of the Golden Nugget

2  entities.

3  **Unjust Enrichment – the Fifteenth Counterclaim for Relief**

4  Unjust enrichment occurs when one party confers a benefit on a second party

5  which accepts and retains the benefit under circumstances such that it would be

6  inequitable to retain the benefit without paying for its value.  *Certified Fire Prot.*

7  *Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012) ("Unjust enrichment exists

8  when the plaintiff confers a benefit on the defendant, the defendant appreciates such

9  benefit, and there is acceptance and retention by the defendant of such benefit under

10  circumstances such that it would be inequitable for him to retain the benefit without

11  payment of the value thereof.").  It reaches beyond retention of money.  *Id.* (The

12  benefit "can include services beneficial to or at the request of the other, denotes any

13  form of advantage, and is not confined to retention of money or property.").  "The

14  doctrine of unjust enrichment or recovery in quasi contract applies to situations

15  where there is no legal contract but where the person sought to be charged is in

16  possession of money or property which in good conscience and justice he should not

17  retain but should deliver to another or should pay for."  *Leasepartners Corp. v.*

18  *Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997)

19  (quoting 66 Am. Jur. 2d *Restitution* § 11 (1973)).  Here, there is evidence that the tax

20  moratorium is a valuable benefit enjoyed by the Golden Nugget entities, conferred

21  upon them at least in part by Chartwell's work in pursuing use tax refunds industry

22  wide, pursuing litigation favorable to casinos, and assisting the State of Nevada in

23  structuring a global settlement and persuading the manifold casinos with refund

24  claims to accept the settlement.

25  The Golden Nugget entities argue that Chartwell cannot pursue the unjust

26  enrichment claim as a matter of law where there is also an existing contract.

27  *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087,

28  1091 (9th Cir. 2003) (a party cannot seek recovery under an unjust enrichment

theory if a contract is the measure of the plaintiff's right); *Leasepartners Corp.*, 942 P.2d at 187 (action based on theory of unjust enrichment not available where there is an express, written contract, because no agreement can be implied when the agreement is express).  Chartwell argues that Nevada courts permit unjust enrichment claims where a contract has expired, or where the benefit conferred was different from the benefit for which the contract was formed.  Here, it appears Nevada law would permit an unjust enrichment claim since the benefit conferred (the industry-wide pursuit of tax relief, the facilitation of a global settlement agreement, and the resulting multi-year tax moratorium) was vastly different in scope and kind from the contracted-for benefit of a tax refund for only the Golden Nugget entities.

The evidence creates genuine issues of material fact concerning whether the Golden Nugget entities received a valuable benefit in the form of the State settlement agreement and tax moratorium conferred upon them by the efforts of Chartwell and for which it would be unjust to retain without payment to Chartwell. The motion for summary judgment is denied on the unjust enrichment claim against the Golden Nugget entities.

### Conclusion

Summary judgment is granted in favor of the Counterclaim defendants Golden Nugget entities on the Thirteenth and Fourteenth Counterclaims based on contract. Summary judgment is denied on the Fifteenth Counterclaim based on unjust enrichment.

DATED:  December 16, 2016

_____
Hon. Roger T. Benitez
United States District Judge