1
2
3
4              **UNITED STATES DISTRICT COURT**

5                    **DISTRICT OF NEVADA**

6   SIERRA DEVELOPMENT CO.              CASE NO. 13cv602 BEN (VPC)
                          Plaintiff,
7
                                        **ORDER GRANTING**
8                                       **COUNTERCLAIMANT**
                                        **CHARTWELL ADVISORY**
9       vs.                             **GROUP, LTD'S,**
                                        **MOTION FOR PARTIAL**
10                                      **SUMMARY JUDGMENT**
                                        **AGAINST**
11                                      **COUNTERCLAIM DEFENDANTS**
                                        **GOLDEN NUGGET, INC., GNLV**
12                                      **CORP., GOLDEN NUGGET**
    CHARTWELL ADVISORY GROUP,           **HOTELS AND CASINOS, and**
13  LTD.                                **PIONEER HOTEL, INC.**

14                         Defendant.   [Dkt. # 527]

15  -----------------------------------------

16  CHARTWELL ADVISORY GROUP,
    LTD.
17
                      Counterclaimant,
18
    vs.
19
    SIERRA DEVELOPMENT CO., et
20  al.,

21                  Counterdefendants.

22

23

24          Now before the Court is Counterclaimant Chartwell Advisory Group, Ltd's,

25  Motion for Partial Summary Judgment against Counterclaim Defendants

26  Golden Nugget, Inc., GNLV Corp., Golden Nugget Hotels and Casinos, and Pioneer

27  Hotel, Inc.

28          Chartwell asserts three counterclaims against the Golden Nugget, Inc., GNLV

1 Corp., Golden Nugget Hotels and Casinos, and Pioneer Hotel in its Third Amended

2 Answer and Counterclaim.[1]  As discussed in other orders of this Court, this case

3 concerns taxes owed to the State of Nevada when a gaming casino or restaurant

4 provides a meal to a patron or an employee on a complimentary basis.

5      This motion concerns only tax refunds and credits for *non-gaming*

6 complimentary meal use taxes (*i.e.*, generally speaking, use taxes paid for

7 complimentary meals given to the taxpayer's own employees or complimentary

8 meals given to the taxpayer's customers in circumstances where the meals were not

9 tied to amounts actually gambled).  Unlike the use tax refund requests for gaming-

10 related complimentary meals which were ultimately withdrawn as part of a

11 settlement agreement with the State of Nevada, these Counterclaim Defendants

12 actually received tax credits in amounts certain from the State of Nevada.

13      Pioneer Hotel received a tax credit from the State of Nevada Department of

14 Taxation in the amount of $296,028.  *See* Chartwell Mot., Ex. C(27).  Brenda

15 Canter, Rule 30(b)(6) witness for Pioneer Hotel testified that "We did get a credit . .

16 . [o]f the 296,028."  *See* Chartwell Mot., Ex. G, at p.139:5-7.  Canter testified that

17 Pioneer received notice of the credit in September 2013 and "started utilizing the

18 credit in October."  *Id.* at p. 139:9-11.  Canter testified that the tax credit has been

19 exhausted.  *Id.* at p. 139:14-15.

20      GNLV Corporation received a tax credit from the State of Nevada

21 Department of Taxation in the amount of $487,705.  *See* Chartwell Mot., Ex. C(29).

22 Golden Nugget Laughlin received a tax credit from the State of Nevada Department

23 of Taxation in the amount of $4,900.  *See* Chartwell Mot., Ex. C(30).  Kenneth

24 Kelly Roberts, Rule 30(b)(6) witness for Golden Nugget, Inc., GNLV Corp., and

25 Golden Nugget Hotels and Casinos, testified that, in total, "We received $492,605

26 as a tax credit."  *See* Chartwell Mot., Ex. E, at p. 144:16.  Roberts testified that the

27

28     [1]The Third Amended Answer and Counterclaim was filed (with leave) during the pendency of the motion.  The pleading amendment does not moot the motion and the Court may now consider and rule on the motion.

1  tax credit was used for future sales tax payments.  "It reduced the cash we had to
2  pay for future sales tax," according to Roberts.  *Id.* at p. 156:15-16.

3      Against this backdrop, Chartwell moves for partial summary judgment.  The
4  Court finds there are no genuine issues of material fact as to the breach of contract
5  claim for the actually-received non-gaming complimentary meal use tax credits and
6  grants partial summary judgment in favor of Chartwell.

7  **I.  LEGAL STANDARDS**

8      Summary judgment is appropriate when "there is no genuine dispute as to any
9  material fact and the movant is entitled to judgment as a matter of law."  Fed. R.
10 Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48
11 (1986).  The evidence of the non-movant is to be believed, and justifiable inferences
12 are to be drawn in his favor."  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H.*
13 *Kress & Co.*, 398 U.S. 144, 157 (1970)).  However, the inferences that may be
14 drawn are not limitless.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809
15 F.2d 626, 632 (9th Cir. 1987).  Inferences must be based on specific facts and only
16 "'rational' and 'reasonable'" inferences may be drawn.  *Id.*; *United Steelworkers of*
17 *Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

18     A moving party bears the initial burden of showing there are no genuine
19 issues of material fact.  *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th
20 Cir. 2007) (citing *T.W. Elec. Serv., Inc.*, 809 F.2d at 630).  The moving party can do
21 so by negating an essential element of the non-moving party's case, or by showing
22 that the non-moving party failed to make a showing sufficient to establish an
23 element essential to that party's case, and on which the party will bear the burden of
24 proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

25     "Only disputes over facts that might affect the outcome of the suit under the
26 governing law will properly preclude the entry of summary judgment.  Factual
27 disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S.
28 at 248.  As a general rule, the "mere existence of a scintilla of evidence" will be

insufficient to raise a genuine issue of material fact; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* at 252. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. 327 (quoting Fed. R. Civ. P. 1).

## II. CHOICE OF LAW – NEVADA STATE LAW

To determine the applicable substantive law, a federal court sitting in diversity must apply the choice-of-law rules of the forum. *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010). As this Court has recently found and discussed in other orders, although the contracts between Chartwell and the Counterclaim defendants, Pioneer Hotel and the Golden Nugget parties, provide that the law of Pennsylvania is to be applied, Pennsylvania has no more than a modest relationship to the controversy. All of the substantial events took place in and with the State of Nevada. Therefore, the Court finds that Nevada state law applies.

## III.  DISCUSSION – BREACH OF CONTRACT

Chartwell moves for partial summary judgment on the Fifth Claim for Relief in its Third Amended Answer and Counterclaim against the Golden Nugget parties and its Eleventh Claim for Relief in its Third Amended Answer and Counterclaim against Pioneer Hotel.

To state a claim for breach of contract in Nevada, a plaintiff must demonstrate: (1) the existence of a valid contract; (2) that plaintiff performed or was excused from performance; (3) that the defendant breached the contract; and (4) that the plaintiff sustained damages. *Calloway v. City of Reno*, 1993 P.2d 1259, 1263 (2000). Interpreting an unambiguous contract is generally a question of law. *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013). In Nevada, contractual construction is a question of law and "suitable for determination by summary judgment." *Ellison v. California State Auto. Ass'n*, 797 P.2d 975, 977

(Nev. 1990).  "It has long been the policy in Nevada that absent some countervailing reason, contracts will be construed from the written language and enforced as written."  *Id.*  On the other hand, summary judgment is improper if the court must use extrinsic evidence to determine the meaning of an ambiguous term within the contract.  *Dickenson v. State, Dep't of Wildlife*, 877 P.2d 1059, 1061 (Nev. 1994).

A contract is ambiguous if its terms may reasonably be interpreted in more than one way, but ambiguity does not arise simply because the parties disagree on how to interpret their contract."  *Galardi*, 301 P.3d at 366.  "Rather, an ambiguous contract is an agreement obscure in meaning, through indefiniteness of expression or having a double meaning."  *Id.* (internal quotation marks omitted).  In other words, once this Court initially determines that "the language of the contract is clear and unambiguous, the contract is enforced as written."  *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015).  "[I]f no ambiguity exists, the words of the contract must be taken in their usual and ordinary signification."  *Traffic Control Servs., Inc. v. United Rentals Nw., Inc.*, 87 P.3d 1054, 1059 (Nev. 2004) (internal quotation marks omitted).

According to the ordinary significance of the terms of the contract, Chartwell would earn a fee equal to a percentage of the "Total Refund" recovered by the casino client.  For example, in the PSA between Chartwell and Pioneer Hotel and Gambling Hall (dated December 11, 2002), Article 4.A states that: *"For complimentary items, Chartwell's fee for services rendered to Client shall be forty percent (40%) of the Total Refund."*  *See* Joint Appendix Exh. 15.  "Total Refund" is defined in Article 1.G as follows: "*The Total Refund shall include all sales and use, hotel, business . . . taxes, plus interest and penalties refunded as a result of the efforts of Chartwell.*"

"Refund" has a plain meaning.  According to Black's Law Dictionary (Ninth edition), the first meaning of the term "refund" is: "the return of money to a person

who overpaid, such as a taxpayer who overestimated tax liability or whose employer withheld too much tax from earnings." The second meaning is similar: "the money returned to a person who overpaid." A refund is a return of money. This much is plain. And because it is plain, the term may be interpreted by a court without resort to extrinsic evidence. A tax refund of a fixed amount of money is the basis upon which the professional services fee was to be calculated: "*Chartwell's fee for services shall be forty percent (40%) of the Total Refund.*" Without a tax refund of a specific amount, there was no fee to be calculated. This is a typical agreement with typical contingency fee terms based on a typical expectation of likely events. The contract makes clear that Chartwell's fee is dependent upon recovering refund money for its client: "*It is understood and agreed that the services rendered by Chartwell are upon a contingent fee basis and, if no amounts are recoverable, Client shall not be indebted to Chartwell for any fees or costs whatsoever.*" Article 2.B.

The evidence is undisputed that the Golden Nugget parties and Pioneer Hotel received tax refunds for non-gaming complimentary meals in the form of formal credits of a sum certain to be used against future tax payments. Because a use tax refund was received in the form of a formal tax credit, a fee for services was due under the agreements.

### A. Pioneer Hotel

Pioneer Hotel concedes that it actually did receive a tax credit for use taxes on non-gaming complimentary meals. *See* Pioneer Hotel's Oppo. at 10 ("From the beginning, Pioneer acknowledged the only refund it actually received was the credit for the non-gaming comps."). Moreover, Pioneer Hotel offered to pay Chartwell monthly as the tax credit was used. *Id.* The issue for Pioneer Hotel apparently, is that it did not have enough cash to pay Chartwell's fee all at once. *See* Joint Appendix VI, Ex. 13, Siler Deposition at p. 106:4 to 107:6. As Chartwell did not respond to the proposition to pay the fee as the credit was depleted, and the business

was operating at a loss, Pioneer Hotel apparently did nothing further. *Id.* at p. 107:4 to 109:5 ("Q.  Is there a reason you didn't pay the fee on the invoice, first invoice for non-gaming credits at the time or even a portion of it?  A. Yes.  They didn't have the funds to pay it.").

Pioneer Hotel argues instead that Chartwell breached the Professional Services Agreement first, and that Chartwell's breach excused Pioneer Hotel's fee payment.  Pioneer Hotel argues that Chartwell was contractually bound to use its best efforts to obtain refunds or credits, and that its services would be provided in a "first class, high quality, and professional manner."  Chartwell agrees.  But Pioneer Hotel also argues that Chartwell failed in its handling of the tax refund petitions "by holding them in abeyance and failing to bind the State to the agreement . . . ."  *See* Pioneer Hotel's Oppo. at 12.  Pioneer Hotel asserts that Chartwell had an agreement with the State of Nevada to pay refunds if the *Sparks Nugget* case was successful.  However, because Chartwell "failed" to document the agreement, in Pioneer Hotel's view the State of Nevada was able to renege on the agreement.  In other words, instead of paying a use tax cash refund to Pioneer Hotel, the State of Nevada was able to assert a sales tax deficiency and offset.  (Of course, the State of Nevada did not agree that it reneged on any such agreement.)

Fatally, Pioneer Hotel does not substantiate its theory with evidence sufficient to create a genuine issue of material fact.  It does not cite any evidence.  One might expect to see experts opining that Chartwell's performance was that of a bush-leaguer.  Or that Chartwell's incompetence led to its overlooking some much larger use tax refund that could have been pursued on Pioneer Hotel's behalf.  One might expect to see evidence that Chartwell mismanaged Pioneer Hotel's refund requests.  Or, perhaps a recital of how Chartwell carelessly permitted valuable potential refunds to be extinguished through failing to meet administrative time lines or Tax Division document requests.  There is no hint of such evidence.  Moreover, the argument which Pioneer Hotel does push, rides on top of a suspect premise: that

Chartwell could ever bind the State of Nevada to an agreement to not collect and pursue sales taxes due under state law.  No case is cited for that proposition.

To sum up, no evidence is identified creating a genuine issue of material fact as to the claim: (1) that a contract was made; (2) that Chartwell performed its contract obligations; (3) that Pioneer Hotel received a non-gaming complimentary meal use tax refund in the form of a credit for $296,028; and (4) that Pioneer Hotel has failed to pay Chartwell the contracted fee and Chartwell has been damaged. Therefore, partial summary judgment is awarded to Chartwell in the amount of **$127,292.**  *See* Chartwell Mot. Ex. C(28) (invoice #060-522).  It remains to be determined whether Pioneer Hotel is additionally liable for accrued interest for late payment under the contract or legal fees expended in this case, as this is not addressed by the parties.

In view of the granting of summary judgment on the non-gaming complimentary meal breach of contract claim, and in view of Chartwell's absence of argument on the related duty of good faith, the Court finds the related counterclaims for breach of the duty of good faith and fair dealing and for unjust enrichment to be moot or waived.

### B.  The Golden Nugget Parties

Like Pioneer Hotel, the Golden Nugget parties concede that tax credits (totaling $492,605) were actually received as a refund for use taxes on non-gaming complimentary meals.  *See* Golden Nugget, Inc., GNLV Corp., and Golden Nugget Hotels and Casinos Oppo. at 8 ("[T]he Department issued tax credits to Golden Nugget in the amount of $492,605 for 'Non-Gaming Comp Refund/Credit Claims.'").  And like Pioneer Hotel, the Golden Nugget parties argue that Chartwell breached first – thus excusing the contractual duty to pay Chartwell a fee.

The Golden Nugget parties make *three* arguments along this line.  First, they argue that the tax credits were *not* the result of Chartwell's efforts.  Second, they argue alternatively that Chartwell failed to exercise its best efforts and provide

service in a first class, high quality, professional manner.  Third, they argue that Chartwell efforts included hiring counsel to represent the Golden Nugget parties during the refund process, but that Chartwell failed to obtain the contractually-required prior consent.  Each argument is considered in order.

The Golden Nugget parties first argue that the $492,605 tax credit was not the result of Chartwell's efforts.  They argue that the credit was, instead, a simple by-product of the industry-wide settlement agreement with the State of Nevada.  And they argue that the settlement agreement was chiefly negotiated by the Nevada Resort Association – not Chartwell.  The Golden Nugget parties point to a State of Nevada tax deficiency notice and assert that the deficiency notice was the only direct result of Chartwell's efforts.  The deficiency notice was only an intermediate step, however, between Chartwell's investigation, preparation, and application for use tax refunds, and the use tax credit ultimately received by the Golden Nugget parties.  Moreover, Chartwell points to affirmative evidence that while the Nevada Resort Association was the chief negotiator of the industry-wide settlement agreement, it was Chartwell's own efforts that obtained the State's agreement to issue tax credits for the non-gaming complimentary meals for its clients (described at ¶ 2.5 of the Settlement Agreement).  Peter G. Ernaut, the negotiator for the Nevada Resorts Association, testified that he had not thought about the non-gaming complimentary meal issue, but that it was a legitimate issue that needed to be dealt with.  *See* Chartwell Mot. Ex. B at p. 184:6 to 185:7 ("And these folks . . . to the settlement had a legitimate issue, and we dealt with it.").   It was not a major issue for Ernaut's client.  *Id.* at p. 186:12-25 ("[I]t was not one of the major issues for my client. . . . I mean, I don't remember the non-gaming comp issue being part of the initial deal, just because I don't think anybody knew it existed.").

Eventually, they knew it existed because of Chartwell's efforts by Chartwell's President, Steven Deviney.  See Chartwell Mot. at Ex. A, ¶15 (Declaration of Steven Deviney).  In fact, Chartwell points to an email comment on the settlement

from Barry Lieberman @ southpointcasino.com.  Lieberman makes the observation that Chartwell's clients were going to receive refunds while other Nevada Resorts Association members would not.  *Id.* at Ex. C(7) ("This is bullshit.  Why don't we just call it the [D]eviney client relief act. . . . [Nevada Resorts Association] members have been sold down the river while [M]r. [D]eviney's clients get refunds.").  There is no genuine issue of material fact evidenced for the argument that the tax credits were not received due to Chartwell's direct efforts.

The Golden Nugget parties' second argument is likewise unsupported by evidence sufficient to demonstrate a genuine fact issue.  The second argument echoes Pioneer Hotel's argument that Chartwell breached its duty to use its best efforts and provide a first class, high quality, professional service.  According to the Golden Nugget parties, the breach is evidenced by Chartwell's failure to properly document or enforce the agreement with the State of Nevada to apply the *Sparks Nugget* case to all of Chartwell's clients.  While that is undisputed, there is no evidence offered to interpret Chartwell's action (or inaction) as unprofessional, low quality, second class, or lacking effort.  The Golden Nugget parties offer no evidence.  There is no evidence that Chartwell did not use best efforts.  There is no evidence that Chartwell's service was not first class.  As mentioned earlier, it is not at all clear that the State of Nevada renounced or denied its agreement.  And it is not at all clear that documenting whatever agreement there was would have enabled Chartwell to force a sovereign State to refrain from assessing arguably valid sales taxes and offsetting refunds due against deficiencies owed by the Golden Nugget taxpayers.  Quite the opposite, it appears that Chartwell's efforts on behalf of the Golden Nugget parties and its other clients were carried out well enough to create a multi-million dollar claim against the public fisc necessitating action by the State Department of Taxation, the State Legislature, and the Governor.  There is no genuine issue of material fact evidenced for the argument that Chartwell first breached its contractual duties, which, in turn would have excused the Golden

1   Nugget parties from paying the contracted fee on its non-gaming complimentary
2   meal use tax credit.

3       The third argument of the Golden Nugget parties has more heft.  They argue
4   that Chartwell did not obtain consent before hiring counsel, that prior consent is
5   required under the contract, and that as a result, the Golden Nugget parties do not
6   owe anything for counsel's fees.   The Court agrees.  The Professional Services
7   Agreement required the client's consent.  *See* Chartwell Mot. Ex. C(8), ¶2C ("All
8   appeals for refund requiring outside legal counsel shall be undertaken only by the
9   mutual consent of both Client and Chartwell.").  The Golden Nugget parties provide
10  cogent evidence demonstrating that they never gave consent.  Chartwell's only
11  evidence to the contrary is a letter from the State of Nevada to John S. Bartlett.  *See*
12  Golden Nugget Oppo. at Ex. K, p. 6 (letter dated August 30, 2012).  Bartlett was the
13  attorney Chartwell hired.  The letter is not addressed to Golden Nugget but indicates
14  a carbon copy was to be sent.  From this, Chartwell argues that the Golden Nugget
15  parties must have known they were being represented by Bartlett and thereby
16  implicitly consented.  That is thin ice.  Chartwell's evidence shows a possibility the
17  letter was received.  But in the letter, Bartlett is not named as an attorney,
18  designated as "Esq." or "Esquire" or referred to as counsel for Golden Nugget.  *Id.*
19  In other words, from simply reading the letter, it is not apparent that Bartlett is an
20  attorney.  It is insufficient to create a genuine issue of fact.  Chartwell's evidence of
21  consent amounts to no more than a scintilla, which is not enough for summary
22  judgment.

23      To restate the case, Chartwell has proved without a genuine issue of material
24  fact: (1) that a contract was made; (2) that Chartwell performed its contract
25  obligations; (3) that the Golden Nugget parties received a non-gaming
26  complimentary meal use tax refund in the form of credits for a total amount of
27  $492,605; and (4) that the Golden Nugget parties have failed to pay Chartwell the
28  contracted fee (other than the amount invoiced for un-consented legal fees) and

Chartwell has been damaged.  Therefore, partial summary judgment is awarded to Chartwell in the amount of $70,066, plus $20,744, plus $490, for a total of **$91,300** with the deduction for the legal fee.  *See* Chartwell Mot. Ex. C(31) (invoice #060-510 reflecting invoice of $10,510 for legal fees, invoice #060-511, and invoice #060-512).  It remains to be determined whether the Golden Nugget parties are also liable for accrued interest for late payment under the contract or legal fees expended in this case, as this is not addressed by the parties.

In view of the granting of summary judgment on the non-gaming complimentary meal breach of contract claim, and in view of Chartwell's absence of argument on the related duty of good faith, the Court finds the related counterclaims for breach of the duty of good faith and fair dealing and for unjust enrichment to be moot or waived.

## IV.  CONCLUSION

Therefore, partial summary judgment is awarded to Chartwell against Pioneer Hotel, Inc. in the amount of $127,292, and against the Golden Nugget parties in the amount of $91,300.

DATED:  January 13, 2017

_____
Hon. Roger T. Benitez
United States District Judge