# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| SIERRA DEVELOPMENT CO.<br>Plaintiff,<br>vs.<br>CHARTWELL ADVISORY GROUP, LTD.<br>Defendant.<br>------------------------------------------------<br>CHARTWELL ADVISORY GROUP, LTD.<br>Counterclaimant,<br>vs.<br>SIERRA DEVELOPMENT CO., et al.,<br>Counterdefendants. | CASE NO. 13cv602 BEN (VPC)<br><br>MEMORANDUM DECISION |

A bench trial was held on the remaining counterclaim for unjust enrichment or quantum meruit by Chartwell Advisory Group, Ltd. against the remaining casino counterclaim defendants[1] and the counterclaim defendants' counter-counterclaims

---

[1] Harrah's Las Vegas, LLC, Harrah's Laughlin, LLC, and Rio Properties, LLC, MGM Resorts International, Mandalay Resort Group, MSE Investments, Inc., Gold Strike Investments, Inc., Newcastle Corp., Ramparts, Inc., and Pioneer Hotel, Inc.

- 1 -

against Chartwell. Having heard the testimony and the evidence, the Court finds that Chartwell provided services for the counterclaim defendants. However, Chartwell has not proven that the services were clearly of value. The Court adopts in full the Joint Proposed Findings of Fact filed on March 9, 2018.[2]

**Background**

This case concerns the State of Nevada's taxation of complimentary meals provided by the counterclaim defendant casinos. The details have been described in earlier orders. In short, Chartwell saw a way to seek refunds of the Nevada use tax paid on complimentary casino meals. Chartwell offered their services to these counterclaim defendants and many other Nevada casinos. Chartwell offered to obtain use tax refunds and keep a percentage of the refund as a contingency fee. Contingency fee contracts were signed. Chartwell submitted numerous use tax refund requests on behalf of its clients. Numerous other casinos likewise sought use tax refunds. Refunds were denied. Appeals were filed. In 2008, the Nevada Supreme Court ruled that the State of Nevada could not lawfully impose a use tax on complimentary meals. *See Sparks Nugget Inc. v. State of Nevada ex rel. Dept. of Taxation*, 179 P.3d 570, 576-77 (Nev. 2008). At the same time it also hinted that the State could replace the lost tax revenue by collecting a sales tax on these same complimentary meals. *Id.* at n.15 ("Still, we do not foreclose the possibility that complimentary meals such as the ones at issue in this case may be subject to sales tax where consideration is properly demonstrated.").

Instead of paying use tax refunds, the Nevada Department of Taxation began assessing against the casinos deficiency amounts for unpaid sales taxes on past the complimentary meals. Chartwell's contracts did not anticipate that tax twist. And because the use tax was computed on the wholesale value of a meal while the sales tax is computed on the retail value of the meal, the counterclaimant defendants

---

[2] The motion to strike (docket no. 686) Chartwell's proposed damages calculation is denied.

faced an even larger sales tax liability. In 2013, an industry-wide settlement was reached between the Nevada casino industry and the Governor's Office. In essence, the casinos (including the counterclaim defendants) agreed to withdraw their use tax refund requests and the Nevada Department of Taxation agreed to withdraw its sales tax deficiencies, in expectation that the Nevada Legislature would pass legislation creating a sales tax moratorium on complimentary meals through the year 2019. It was a walk away agreement. As it turned out, legislation was passed in the waning days of the 2013 legislative session.

**Quantum Meruit**[3]

Previously, this Court found that the contracts did not contemplate that the casinos would pay Chartwell for a refund never actually received and encumbered with a greater sales tax liability. Likewise, the contracts never contemplated that the Governor would seek an industry-wide settlement or that the Nevada Legislature would change the tax laws. Consequently, the casinos traded any future refund they might or might not receive in exchange for the elimination of a looming past sales tax liability on complimentary meals and legislation that could provide sales tax relief for their patrons through 2019. They exchanged the uncertainty of tax litigation, on the one hand, for the certainty of relief, on the other hand, from sales tax liability looking backward and looking forward. Whether that relief from a sales tax was a valuable benefit at all, and if so, whether the benefit was due to Chartwell's efforts, is the subject of the quantum meruit claim.

Where, as here, Chartwell's clients win the right to a use tax refund, but as a result face an equal or larger sales tax liability, it cannot be said that the clients received a valuable benefit. That the Department of Taxation would offset a use tax refund against its concomitant sales tax deficiency was no mere hyperbole. For

---

[3] For the applicable substantive law, a federal court sitting in diversity usually applies the law of the forum. *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010). Here, because it is the situs of the relevant activities, Nevada law applies.

- 3 -

example, in Harrah's litigation against the State, the Nevada state district court ruled that the State can offset any refund of use tax due to Harrah's with sales tax that was imposed pursuant to a timely deficiency determination. *Harrah's Entm't Grp. v. Nevada, et al.*, slip op. at *7, Case No. 12 C 2641B (1st Judicial District Court of Nevada Apr. 25, 2013). Chartwell deemed it a win because of the favorable statute of limitations ruling. But the State would have likely appealed. Consequently, any potential right to a use tax refund had little concrete value for the counterclaim defendants. These Chartwell clients ended up in roughly the same position they would have been without Chartwell's services. In trying to harvest some honey, Chartwell stirred up a hive of angry tax bees.

Under the law of Nevada, "[a] plaintiff seeking to recover in quantum meruit must demonstrate, *inter alia*, that its services 'conferred a benefit on the defendant.'" *Las Vegas Sands Corp. v. Suen*, No. 64594, 2016 WL 4076421, at *3 (Nev. July 22, 2016) (quoting *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012)). "Likewise, to have 'value' means to be significant, desirable, or useful." *Id.* (citing Value, Black's Law Dictionary (10th ed. 2014)). "In the context of quantum meruit, we conclude the terms 'value' and 'benefit' are interchangeable, as useful or desirable services are those that provide some form of advantage." *Id.* "[W]e have distinguished between services that provide value and those that either harm the recipient or leave him in the same position he would have been without the services." *Id.* (citing *Certified Fire*, 283 P.3d at 258; *Thompson v. Herrmann*, 530 P.2d 1183, 1186 (Nev. 1975)). "[T]he market value of ... services is the remedy traditionally known as quantum meruit." Restatement (Third) of Restitution and Unjust Enrichment § 49(3)(c) & cmt. f (2011).

Chartwell has not proven by substantial evidence that its services to these counterclaim defendants up to that point (*i.e.*, before the Governor's office began settlement talks) conferred a valuable benefit. Therefore, Chartwell recovers nothing in quantum meruit for these services. *Id.*; *see also* Restatement (Third) of

Restitution and Unjust Enrichment §34, cmt. 3 (2011) (interruption by supervening circumstances may result in no unjust enrichment).

Beyond that point (*i.e.*, after the Governor's Office began settlement overtures), Chartwell provided additional services to these counterclaim defendants in the form of taking part in the industry-wide settlement agreement and getting the settlement agreement approved. Again, substantial evidence is lacking that would prove the services were valuable.

The problem with Chartwell's claim for quantum meruit is that the industry-wide settlement was instigated by the Governor's Office for the benefit of all of the citizenry and required the independent approval of the legislature in the form of tax moratorium legislation. The State of Nevada desired a global settlement of all use tax refund cases. The legality of imposing sales tax deficiencies to offset use tax refunds was uncertain. Test cases had been instituted and decisions had been issued at the trial court level. The Nevada Supreme Court had hinted about its approval of a sales tax but statute of limitations issues existed.

The Nevada Department of Taxation might have ultimately won approval of its sales tax deficiency program. In that case, it would have happily traded the right to collect use taxes in exchange for the right to impose even higher sales taxes. Or it could have lost. Had the State lost in the Supreme Court, a $233 million dollar use tax refund liability would remain and would have grown even larger due to accumulating interest. The State of Nevada sought to settle its fiscal uncertainty and made the first move. The Governor's office invited the Nevada Resorts Association ("NRA") to meet. Chartwell met separately. A concession was included in the proposal for some of Chartwell's other clients. Once the NRA's casino members were in agreement, the smaller non-member casinos needed to be brought in. Chartwell volunteered and did help gain the approval of a number of smaller casinos. But the evidence on Chartwell's efforts and successes in this regard was slim and difficult to evaluate. Not all of the casinos in the State signed

on. Whether the Governor would have proceeded without the approval of the Chartwell-obtained casinos is unknown. The evidence showed the Governor wanted 100% agreement. The evidence also showed that 100% agreement was not obtained, but the settlement was still achieved. One could reasonably infer that the Governor would have moved forward regardless – having won the approval of the large number of casino members of the NRA.

Once the agreement was finalized, the legislature had to be persuaded to pass legislation. In short, it was a global settlement at the instigation of the State. It required the agreement of the State (over which Chartwell had no influence). And it required the agreement of the casino members of the NRA (which was obtained without the help of Chartwell). It required legislation to be considered and passed by the legislature. Individual legislators presumably considered the merits and demerits of the Governor's proposed tax legislation and voted their individual opinions. There is no evidence that it was a settlement at the instigation of Chartwell. There is no evidence that it was something that Chartwell could have engineered on its own. The value of the services it did perform is speculative. The value of the services conferred on these particular counterclaim defendants is even more speculative.

The Nevada Supreme Court recently explained the purpose of a quantum meruit claim. *See Risinger v. SOC LLC*, 936 F. Supp. 2d 1235, 124647 (D. Nev. 2013) (analyzing *Certified Fire Prot.*). There are two related contexts: contract and restitution. In the former, quantum meruit applies in an action based upon a contract implied-in-fact, which is found when the parties intended to contract and promises were exchanged. *Risinger,* 956 F. Supp. 2d at 1247 (*quoting Certified Fire,* 283 P.3d at 256). In that circumstance, quantum meruit may be employed as a gap-filler to supply absent terms. *Id.* Quantum meruit's other role is in providing restitution for unjust enrichment. *Id.* In this circumstance, quantum meruit imposes liability for the market value of services as a remedy. *Certified Fire*, 283 P.3d at

256 (*quoting* Restatement (Third) of Restitution and Unjust Enrichment § 49 (2011)). This is the form of quantum meruit that applies in this case. [4]

To succeed in quantum meruit, the benefit conferred on the counterclaim defendants must have been conferred by Chartwell, it must be valuable, and the value must be reasonably calculable. Here, there is evidence that the tax moratorium has some benefit to the counterclaim defendants. But the benefit is not necessarily valuable. Moreover, the evidence at trial provides no reasonable basis on which to calculate the actual value and attempting to perform such a calculation of value would be improperly speculative.

Not all services performed or benefits conferred are valuable. For example, when one builds a dam for another but the structure is unsafe and must be completely rebuilt, it cannot be said that the building of the defective dam was a valuable benefit conferred. *See Certified Fire*, 283 P.3d at 258 ("[D]efendant was to build a dam for the plaintiffs but the defendant's preliminary work failed to meet state regulations and thus was rendered useless. Because the plaintiffs were required to hire a new laborer to completely rebuild the dam to code, this court held that the defendant could not recover on his counterclaim under a theory of quantum meruit because he had provided no benefit to the plaintiffs, *i.e.*, while he began the work the plaintiffs requested, he ultimately provided no advantage to them.") (citations omitted).

The evidence at trial concerning value was speculative and evanescent. Chartwell asserts that its services conferred a valuable benefit industry-wide by pursuing use tax refunds and litigation favorable to casinos, assisting the State of Nevada in structuring a global settlement, and persuading the manifold casinos with

---

[4] "When a plaintiff seeks as much as he deserves based on a theory of restitution (as opposed to implied-in-fact contract), he must establish each element of unjust enrichment." *Certified Fire Prot.*, 283 P.3d at 256–57 (citations omitted).

refund claims to accept the settlement.

The evidence at trial proved less. It proved that Chartwell was not alone in seeking use tax refunds from the State. Although Chartwell's clients may have made up a large fraction of all the casinos seeking refunds, many casinos did the same without Chartwell's assistance. Perhaps if Chartwell had represented the entire casino industry, it could be said that their services alone spurred the refund exposure which brought the Governor's Office to the bargaining table. Assuming for the moment that was a valuable benefit (an unproven assumption), evidence of its value is entirely speculative. On the other hand, perhaps if Chartwell had pursued use tax refunds for only these few counterclaim defendants, rather than numerous casinos, the State would have simply paid the refunds and Chartwell would have earned its contingency fee.

Chartwell asserts that with the *Sparks Nugget* decision, the counterclaim defendants obtained a valuable right to a full and certain use tax refund. But that decision opened the door wide for the State to setoff refunds with new sales tax deficiency notices. At that point, a use tax refund was of no greater value to the counterclaim defendants than a defectively-built dam.

Chartwell asserts that with its services, it was able to get the remaining small casinos to agree to the settlement with the Governor's Office. Certainly the Governor wanted all of the casinos to sign the agreement. But the evidence was unclear whether the Governor would have proceeded anyway without the agreement of the small number of casinos that Chartwell cajoled and corralled.

Chartwell asserts that the resulting legislative tax moratorium is a valuable benefit conferred on the counterclaim defendants in the amount of the sales tax that would have been collected from the counterclaim defendants. There are a few problems with that approach. First, it was the independently-acting legislature that passed the sales tax moratorium, not Chartwell. Second, sales tax is imposed on the customer rather than the casino provider of complimentary meals. It is a customer's

liability.  Strictly speaking, even without the passage of the new legislation, the casinos would not pay a sales tax going forward; the casinos would simply collect the tax from customers.  Of course, it is plausible that a casino that collects sales tax on a patron's otherwise complimentary meal, may lose patronage to a different casino that makes a business decision to cover the patron's tax obligation.  However, there was no evidence on the value of such a business advantage or disadvantage for the counterclaim defendants.

Further diminishing whatever value the sales tax moratorium has, there is evidence that the State imposed higher taxes on the counterclaim defendants in other areas of their business.  This is not surprising and is likely due to the State's need to make up for lost sales tax revenue.  To borrow a phrase, perhaps there is no such thing as a tax-free, free lunch.  Once again, like the use tax refund that was set off by a past sales tax deficiency, the new statutory sales tax moratorium may be of no greater value to the counterclaim defendants than a defectively-built dam.

Pleading quantum meruit for unjust enrichment does not discharge the plaintiff's obligation to demonstrate that the defendant received a benefit from services provided. Restatement (Third) of Restitution and Unjust Enrichment § 31 cmt. e (2011); 1 Dan B. Dobbs, Dobbs Law of Remedies § 4.2(3) (2d ed. 1993) (plaintiff pursuing quantum meruit under unjust enrichment theory must show benefit to defendant).  "The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–63 (1931); *see also Knier v. Azores Const. Co.*, 368 P.2d 673, 675 (Nev. 1962) (loss of prospective profits of a new motel business enterprise was too uncertain and speculative to form a basis for recovery).

In this case the Court has no reasonable basis on which to find or calculate actual damages and any attempt to do so would be improperly speculative. Principles of unjust enrichment will not support the imposition of a liability that

leaves an innocent recipient worse off (or not demonstrably better off) than if the transaction with the claimant had never taken place. Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d (2011). Because Chartwell did not carry its burden to prove the that its services were valuable to the counterclaim defendants or prove a reasonably certain way to calculate the value of such services, the unjust enrichment or quantum meruit claim fails. *Lee v. Enter. Leasing Co.-W., LLC*, 30 F. Supp. 3d 1002, 1019 (D. Nev. 2014) (granting summary judgment in favor of Defendants where evidence of damages was too speculative).

**Counterclaims against Chartwell**

The counterclaim defendants also sought to prove that Chartwell breached a contract, a duty of good faith and fair dealing, and a fiduciary duty. There is no evidence to support these counter-counterclaims.

**Pioneer Contract Late Fees**

Counterclaim defendant Pioneer Hotel, Inc., received an unencumbered use tax credit and owed Chartwell its agreed contingency fee as a result. Because Pioneer did not pay the fee at the time, late fees have accrued. Using the rate of interest specified in the Pioneer PSA, with interest beginning to run September 28, 2013, Pioneer owes Chartwell $40,790.72 in late fees for its failure to pay Chartwell's invoice for Non-Gaming Complimentary Meals up to July 24, 2017, and at the rate of $34.57 a day thereafter.

**Conclusion**

Counterclaimant Chartwell has not proven by a preponderance of the evidence that it is entitled to damages in the form of unjust enrichment or quantum meruit from the counterclaim defendants. Judgment is entered in favor of the counterclaim defendants.

The counterclaim defendants have not proven by a preponderance of the evidence that they are entitled to damages from Chartwell for breach of contract, breach of the duty of good faith and fair dealing, or breach of a fiduciary duty.

Judgment is entered in favor of Chartwell on the counterclaim defendants' counter-counterclaims.

Pioneer Hotel, Inc., owes Chartwell contractual late fees as described above. Judgment is entered in favor of Chartwell and against Pioneer Hotel, Inc.

Dated: July 6, 2018

ROGER T. BENITEZ
UNITED STATES DISTRICT JUDGE